**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 26 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 00-3056

MICHAEL P. McELHINEY,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 98-CR-40083-01-RDR)**

Stephen W. Kessler, Esq., Topeka, Kansas, for the Defendant-Appellant.

Thomas G. Luedke, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with him on the briefs), Topeka, Kansas, for the Plaintiff-Appellee.

Before **KELLY** , **HOLLOWAY** , and **HENRY** , Circuit Judges.

**HENRY** , Circuit Judge.

Michael P. McElhiney was indicted by a federal grand jury of conspiracy to distribute and possess heroin with the intent to distribute it, a violation of 21

U.S.C. §§ 846 and 841(b)(1)(C). The conspiracy charge was based on Mr. McElhiney's alleged involvement in a drug smuggling operation in the Leavenworth, Kansas federal penitentiary between January and September 1995. In July 1999, a jury trial was held, during which Mr. McElhiney represented himself with the assistance of standby counsel. The result of the trial was a hung jury: ten to two in favor of conviction. A second jury convicted Mr. McElhiney several months later. He now appeals on various grounds, and we reverse and remand.

## I.  BACKGROUND

The prison drug smuggling operation in which Mr. McElhiney was allegedly involved first came to light while the government was investigating the murder of a prisoner, Charles Leger, at the Leavenworth penitentiary. An inmate by the name of Allen Hawley came forward with information related to the murder. According to Mr. Hawley, the murder was ordered by the leadership of the Aryan Brotherhood, a prison gang in which Mr. McElhiney was a ranking member. Eventually, Gregory Storey, another inmate associated with the Aryan Brotherhood, was charged with the murder. During the trial of Mr. Storey, Mr. Hawley provided testimony on behalf of the government. Mr. Hawley discussed not only the murder but also the prison drug smuggling operation.

On September 9, 1998, a federal grand jury indicted Mr. McElhiney for conspiracy to distribute and possess heroin with the intent to distribute it, a violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). The result of the subsequent trial, during which Mr. McElhiney represented himself, was a hung jury. A second jury trial began on September 28, 1999, with Mr. McElhiney once again choosing to exercise his right to self-representation. During trial, the government presented testimony from various witnesses, including several inmates and former inmates, in support of its case. The inmate witnesses primarily testified as to Mr. McElhiney's membership in the Aryan Brotherhood and his involvement in the prison drug smuggling operation. Notably, many of the inmates admitted to having participated in the operation themselves.

After each party had presented its evidence, deliberations began. They continued for the next two-and-a-half days, at which point, just as in the first trial, the jury informed the district court that it was unable to reach a verdict. Several hours later, after the district court addressed the jurors and asked, in effect, for continued deliberations, the jury reached a guilty verdict.

On appeal, Mr. McElhiney argues that: (1) the government twice violated the rule established in Brady v. Maryland, 373 U.S. 83 (1963); (2) a government agent interfered with his Sixth Amendment right to counsel; (3) the district court's Allen charge was impermissibly coercive; (4) his conviction and sentence

were improper in light of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000); (5) the government improperly bolstered witness testimony; and (6) he was denied an impartial jury.

## II. BRADY ARGUMENTS

We begin our analysis with Mr. McElhiney's two <u>Brady</u> arguments. In <u>Brady</u>, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." <u>Brady</u>, 373 U.S. at 87. According to Mr. McElhiney, the government violated <u>Brady</u> first by failing to turn over to the defense a Bureau of Prisons memorandum and second by failing to yield to the defense the personnel file of Dennis Conway, a special agent for the FBI. We address each of these arguments in turn.

## A. Bureau of Prisons Memorandum

Mr. McElhiney asserts that the government first violated <u>Brady</u> when it failed to provide the defense with a particular Bureau of Prisons memorandum. After the trial was completed, Mr. McElhiney "was inadvertently provided certain documents" from the Bureau of Prisons. Aplt's Br. at 9. One of the documents that came into his possession was a memorandum entitled "Possible Threats to

Inmates [at the Leavenworth Penitentiary], Re: Aryan Brotherhood

Extortion/Drug Ring." As noted by the district court, this memorandum

> discusse[d] possible threats to various inmates in 1995 which caused
> the inmates to request protective custody. Some of the threats were
> allegedly made by [inmates] who were witnesses against [Mr.
> McElhiney] during the trial. . . . One of the inmates who was
> allegedly threatened [also] testified against [Mr. McElhiney] in the
> trial . . . .

Rec. supp. vol. I, doc. 378, at 1-2 (district court order, filed Mar. 23, 2000).

Mr. McElhiney subsequently filed a motion for a new trial based on this

newly discovered evidence. The crux of his argument was that, by failing to

provide him with the memorandum, the government acted in violation of Brady.

The district court denied the motion, ruling that the memorandum did not violate

Brady as it was neither exculpatory nor material.

"We review de novo allegations of Brady violations." Newsted v. Gibson,

158 F.3d 1085, 1094 (10th Cir. 1998). To establish a Brady violation, a

defendant must show "1) that the prosecution suppressed evidence; 2) that the

evidence was favorable to the accused; and 3) that the evidence was material."

Smith v. Secretary of N.M. Dep't of Corrections, 50 F.3d 801, 824 (10th Cir.

1995) (internal quotation marks omitted).

Without actually deciding the issue, we will assume for the purposes of

discussion that the memorandum was suppressed and that it contains evidence

favorable to Mr. McElhiney. Even so, Mr. McElhiney still must establish that the

memorandum was material. "The standard of materiality required to set aside a criminal conviction on Brady grounds varies with the specificity of the defendant's request and the conduct of the prosecutor." United States v. Buchanan, 891 F.2d 1436, 1441 (10th Cir. 1989). If the defendant makes a "request for specific evidence" and the prosecutor fails "to disclose responsive evidence," then the evidence is material if it "might have affected the outcome of the trial." Id. (internal quotation marks omitted). If the defendant, however, either makes no request for evidence or simply makes a general request (e.g., asking for "all Brady material" or "anything exculpatory"), then the evidence is material only if it "creates a reasonable doubt that did not otherwise exist." Id. (internal quotation marks omitted). We need not decide which standard of materiality is applicable because, even under the more lenient standard, the Bureau of Prisons memorandum was not material.

In particular, as to the memorandum's statement that several inmate witnesses who testified for the government were involved in the drug smuggling operation, that involvement was a fact that they had already—and readily—admitted at trial. Therefore, we agree with the district court that this evidence "was cumulative . . . and thus would have provided only marginal additional support for [the] defense." United States v. Trujillo, 136 F.3d 1388, 1394 (10th Cir. 1998).

-6-

As to the materiality of the memorandum in terms of impeaching Mr. Hawley's testimony, Mr. McElhiney points to a statement in the memorandum that a prisoner named Leonard "Dirty Red" Ternes made a statement in which he denied participation in the prison drug smuggling operation. He notes that, at trial, Mr. Hawley testified that Mr. Ternes was involved in the operation as a "mule."

On this point, we again agree with the district court's analysis. That is, even if the information in the memorandum had been available to Mr. McElhiney before trial, it is not reasonably probable that the outcome would have been different. See id. at 1393 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.") (internal quotation marks omitted). In particular, if introduced at trial, that statement by Mr. Ternes would have contradicted only one part of Mr. Hawley's testimony (which did not even bear directly on Mr. McElhiney). Moreover, Mr. Hawley's testimony was corroborated at trial by other evidence, and the evidence against Mr. McElhiney, apart from Mr. Hawley's testimony, was substantial. To state it simply, the significance of the favorable information in the memorandum was marginal in relation to the record as a whole. See Smith, 50 F.3d at 827 ("In making the materiality determination, we view the suppressed evidence's significance in relation to the record as a whole.") (internal quotation marks omitted). Because

the memorandum—even if suppressed and favorable—was not material, Mr. McElhiney has failed to prove a <u>Brady</u> violation.

## B.  Personnel File

Mr. McElhiney's second <u>Brady</u> argument is similarly without merit.  Even assuming that the government suppressed Agent Conway's personnel file, there is is no evidence in the record—indeed, Mr. McElhiney does not even allege in his brief—that the file was either favorable or material to his case.

## III.  ALLEN CHARGE

We direct our attention now to Mr. McElhiney's argument that the district court gave to the jury an impermissibly coercive <u>Allen</u> charge.  We begin with an overview of the relevant facts and a general history of the charge, largely focusing on its use in the federal courts.

## A.  The Charge in this Case

Mr. McElhiney's second jury trial began on September 28, 1999.  After nine days of proceedings, deliberations began and then continued for the next two-and-a-half days.  On the morning of October 15, 1999, at approximately

10:30 a.m, the jury sent the district court a note, stating that it was not able to reach a verdict.

In response, the district court called the jury to the courtroom. Addressing the jury, the court said: "[L]adies and gentlemen, I have received a note from the jury here that is very distressing to me because this has been one of the greatest major efforts made in time and attention and money that I have noted in my 24 years as being a judge." Rec. vol. XX, doc. 329, at 2 (trial transcript, dated Oct. 15, 1999) [hereinafter Tr.]. The district court asked if the jury was in fact at an impasse, to which the foreperson answered "[y]es, Your Honor." Id. A brief colloquy then took place, during which the foreperson stressed to the district court that "added work" or "read backs" would not assist the jury in reaching a verdict. Id. at 3.

The colloquy was followed by a polling of the individual jurors. In response to the question "[D]o you feel you cannot reach a verdict?" each juror said "[y]es." Id. at 4-5. After the poll was completed, the district court and the foreperson engaged in another colloquy. The exchange was as follows:

> Court: Do you all think that if you deliberated until noon, it would not make any—there would be no change, is that your general consensus, is that what you think?
>
> Foreperson: I would be willing to try if that is your wish.
>
> Court: Well, frankly, I'd like to have you do this. Of course, I do not know what will happen from now on out. I have

no control over that. But we may be doing this again and that's the reason I'd be very happy to have a verdict one way or the other. And it's—but the time and attention and the danger of this case has been, you know, a problem. We've had security in here that was just—I said to somebody we could have fought the Russian Army head on with what we've had here in this case.

Well, I—frankly, the Court would certainly like to have you try to reach a verdict in this case. And why don't you continue your deliberations for a while and see if there's any possibility you can reach a verdict in this case. Are you willing to do that?

Foreperson: I am, yes.

Court: All right. Well, why don't we recess then and you continue to try to deliberate. And if you find that you're absolutely hopelessly deadlocked, why then I would have nothing else I can do except dismiss you with the thanks of the Court. But why don't you give it another try. . . .

Id. at 5-6.

After the district court concluded these comments, the jury exited the courtroom, at which point Mr. McElhiney, acting as his own counsel, objected. Mr. McElhiney expressed concern that the district court's use of the word "danger" "could have coerced the jury into thinking they must reach a verdict." Id. at 6-7. The district court replied, "Well, I'm sure the jury understands that with all the people we've had here that this has been a very difficult case to try.

And so I do not feel that there's anything there that's going to turn a verdict one way or the other."[1]  Id.

At 12:17 p.m., "[j]ust prior to [the jury's] noon break," Aple's Br. at 43, the jury sent a note to the district court, asking for the identification of certain individuals in a picture that was an exhibit in the case.  According to the note, "This information would be helpful . . . in overcoming the hung jury."  See Rec. vol. I, doc. 363, at 8 (district court order, filed Feb. 11, 2000) (quoting jury note). Neither party objected, and so the information was provided.  At 1:50 p.m., the jury sent the district court a second note, this time seeking to rehear the testimony of Mr. Hawley.  The readback of Mr. Hawley's testimony was delayed until 3:50 p.m.  See id. ("[Mr. Hawley's] testimony was lengthy and some time was required to prepare for the readback of this testimony.").  After an hour of the readback, the foreperson indicated that it could stop.  Ten minutes later—i.e., at 5:00 p.m— the jury informed the district court that it had reached a verdict.

Mr. McElhiney subsequently filed a motion for a new trial, repeating his contention that the district court's comments to the jury were improper.  More specifically, he asserted that the district court's statements constituted an impermissibly coercive Allen charge.  In a written order, the district court denied the motion.

---

[1]  Appendix A is a transcript of the proceedings described above.

B. An Overview of the Allen Charge

Pursuant to the Sixth Amendment, "[e]very defendant in a federal criminal case has the right to have his guilt found, if found at all, only by the unanimous verdict of a jury of his peers." United States v. Thomas, 449 F.2d 1177, 1181 (D.C. Cir. 1971) (en banc); see also United States v. Haber, 251 F.3d 881, 888 (10th Cir. 2001) ("The Sixth Amendment guarantees a federal criminal defendant the right to a unanimous verdict.") (internal quotation marks omitted); Fed. R. Crim. P. 31(a) ("The verdict shall be unanimous."). If no unanimous verdict can be attained, then the jury is considered "hung" and a mistrial is declared. Thus, a federal criminal case may terminate with the failure to reach a verdict. See Huffman v. United States, 297 F.2d 754, 758 (5th Cir. 1962) (Brown, J., dissenting) (stating that it is "a basic misapprehension[] that a criminal trial must end with (1) a verdict of guilty or (2) a verdict of not guilty"); see also Paul Marcus, The Allen Instruction in Criminal Cases: Is the Dynamite Charge About to Be Permanently Defused?, 43 Mo. L. Rev. 613, 624 (1978) (stating that there are not two but rather "three possible decisions of the jury").

An Allen instruction is, in effect, a charge given by a trial court that encourages the jury to reach a unanimous verdict so as to avoid a mistrial. See United States v. Rogers, 289 F.2d 433, 435 (4th Cir. 1961) (stating that, through an Allen charge, a trial court "suggest[s] to jurors the desirability of agreement

-12-

and avoidance of the necessity of a retrial before another jury"), abrogated on other grounds by Bell v. United States, 462 U.S. 356 (1983); see also United States v. Smith, 857 F.2d 682, 683-84 (10th Cir. 1988) (stating that purpose of an Allen instruction "is to encourage unanimity"); Hale v. United States, 435 F.2d 737, 741 (5th Cir. 1970) (stating that "[t]he purpose of the Allen charge is to obtain a verdict").  Its name is derived from Allen v. United States, 164 U.S. 492 (1896), in which the Supreme Court first approved a supplemental instruction given to a deadlocked jury.[2]  The Court described the instruction as "taken literally," id. at 501, from a charge approved in Commonwealth v. Tuey, 62 Mass. 1 (1851).  According to the Supreme Court, it provided:

> [I]n substance, [the instruction was] that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they

---

[2]  The trial judge in Allen was Isaac C. Parker, a federal district judge who sat on the United States District Court for the Western District of Arkansas and who was popularly known as "Hanging Judge" Parker.  The trial in which Judge Parker gave this instruction was preceded by two other trials. After both of the previous trials, the Supreme Court reversed the fourteen-year-old defendant's conviction, concluding that Judge Parker had erred in explaining principles of self defense to the jury.  See David B. Kopel, The Self-Defense Cases:  How the United States Supreme Court Confronted a Hanging Judge in the Nineteenth Century and Taught Some Lessons for Jurisprudence in the Twenty-First, 27 Am. J. Crim. L. 293, 313-316 (2000).  The defendant was eventually sentenced to life imprisonment.  See id. at 315.

> should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

Allen, 164 U.S. at 501. The instruction also included a reminder to the jury of the burden of proof. See 6th Cir. Pattern Criminal Jury Instruction § 8.04 cmt. (1991 ed.) (noting that the trial court in Allen told the jury: "'In order to make a decision more practicable, the law imposes the burden of proof on one party or the other, in all cases. In the present case, the burden of proof is upon the government.'"); see also Potter v. United States, 691 F.2d 1275, 1278 (8th Cir. 1982) (noting that "[t]he Supreme Court did not set out the full body of the instruction given in Allen"; then stating that the trial court in Allen "had included from Tuey" a reminder of the burden of proof).

For purposes of clarity, we label an instruction that tracks the above description and that includes a reminder on the burden of proof a "pure" Allen charge. An instruction that departs from the pure charge, whether by omission or embellishment, we call a "modified" Allen instruction. Cf. People v. Gainer, 19 Cal. 3d 835, 844 (1977) ("[I]t is somewhat imprecise to refer to a single Allen charge. Decades of judicial improvisation have produced a variety of permutations . . . ."). Where we do not use the terms "pure" and "modified," we

-14-

speak of Allen instructions, both pure and modified, in general. Today, most Allen instructions are given as supplemental charges to deadlocked juries, just as in Allen itself. The name "Allen charge," however, has been used to describe not only supplemental instructions provided to deadlocked juries but also charges given as part of the original jury instructions.

Interestingly, when the pure Allen charge was first approved by the Supreme Court in 1896, it engendered little to no controversy, presumably because the instruction was seen as an extension of a trial court's power to lend guidance and assistance to a jury in reaching a verdict. See United States v. Winn, 411 F.2d 415, 416 (10th Cir. 1969) (taking note of this "right and duty" of the trial court to guide and assist). As the years passed, the popularity of the instruction quickly grew, "[u]ndoubtedly . . . from its perceived efficiency as a means of 'blasting' a verdict out of a . . . jury." Gainer, 19 Cal. 3d at 844. With the increased use of the charge came an increasing tendency on the part of trial courts to deviate from the language of the pure instruction, often "in an apparent attempt to increase the intensity of the 'blast.'"[3] Id.

---

[3] Because of this "blasting" potential, the Allen charge has commonly been called the "dynamite" charge. See United States v. Bailey, 468 F.2d 652, 666 (5th Cir. 1972) (also describing the instruction as the "third-degree," "shotgun," or "nitroglycerin" charge).

In the latter part of the twentieth century, courts became concerned that the Allen charge might have a coercive element—in other words, that a jury might interpret the instruction encouraging a unanimous verdict as an order to agree. See Thaggard v. United States, 354 F.2d 735, 740 (5th Cir. 1965) (Coleman, J., concurring) (stating that a jury views an Allen charge as "a direct appeal from the Bench for a verdict"). If a jury was in fact coerced into returning a verdict as a result of the charge, then the defendant's due process rights would be violated. See Hale, 435 F.2d at 741 ("Problems arise when the Allen charge is used to coerce the jury into reaching a verdict . . . . [A] coercive charge violates due process . . . ."); Mills v. Tinsley, 314 F.2d 311, 313 (10th Cir. 1963) ("To compel a jury to agree upon a verdict is a denial of a fair and impartial jury trial, and, hence is a denial of due process.").[4]

Because of this concern, many federal courts have voiced criticisms of the Allen instruction, even when given in the form approved by the Supreme Court.

---

[4] Arguably, an impermissibly coercive Allen instruction violates not only a defendant's right to due process but also a defendant's Sixth Amendment rights—more specifically, the right to an impartial jury trial and the right to a unanimous verdict. See Thaggard, 354 F.2d at 740 (Coleman, J., concurring) (stating that an impartial jury means "a jury free of every influence except the law and the evidence"); United States v. Harris, 391 F.2d 348, 355 (6th Cir. 1968) (stating that "[t]he possibility of disagreement by the jury and the lack of a unanimous verdict is a protection conferred upon a defendant . . . by the Constitution"); see also Marcus, supra, 43 Mo. L. Rev. at 628 (discussing constitutional arguments against the Allen charge).

State courts and scholarly commentators have expressed similar opinions.[5]  For example, the use of the following language in the pure instruction has been the basis of many complaints:

> [I]f much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself.  If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

Allen, 164 U.S. at 501.  This language has been subject to much disparagement because it directs only the minority jurors, and not the majority, to reconsider its views as part of the deliberation process.  See United States v. Fioravanti, 412 F.2d 407, 417 (3d Cir. 1969) ("[T]he very real treachery of the [pure] Allen Charge [is that] [i]t contains no admonition that the majority reexamine its position.").  According to the critics, if every juror were called upon to rethink his or her views, and not just the minority, there would be "less intimation that the dissenters are presumably wrong and should capitulate in favor of the view

---

    [5]  For state courts, see United States v. Seawell, 550 F.2d 1159, 1163 n.4 (9th Cir. 1977) (listing state courts that "have banned or restricted the use of the Allen charges on the basis of their supervisory powers"), and Gainer, 19 Cal. 3d at 847 n.8 (listing "[s]tate court cases which have disapproved Allen-type instructions, in whole or in part").  For commentators, see 2A Wright, Federal Practice & Procedure § 502, at 537 n.22 (2000) (listing commentators).

espoused by the greater number of jurors." Smith, 857 F.2d at 684 n.4. In other

words, the possibility of coercion would be less likely.[6]

In spite of such critiques, federal courts have been reluctant to hold that the

Allen charge—at least in its pure form—is impermissibly coercive and therefore a

violation of due process. See Wright, supra, § 502, at 540. Still, unhappiness

with the instruction has given rise to a variety of new developments. For

example, some circuit courts emphasize that the pure Allen instruction approaches

the "ultimate permissible limits" or the "outermost limit of . . . permissible use"

with respect to a trial court's prerogative to guide and direct a jury toward a

verdict. Id. § 502, at 533 (internal quotation marks omitted). Departures from the

pure instruction have been thereby discouraged, see United States v. Scott, 547

F.2d 334, 337 (6th Cir. 1977) ("Any variation upon the precise language approved

in Allen imperils the validity of the trial."), though some variations have still

passed constitutional muster if they do not heighten the coercive element already

existing in the charge. See, e.g., Smith, 857 F.2d at 684 (noting that, in this

_____

[6] In Lowenfield v. Phelps, 484 U.S. 231 (1988), the Supreme Court
emphasized that the pure Allen charge, which admonished only the minority, and
not the majority, was still valid. It conceded, however, that a modified
instruction, one that did not single out the minority, was less coercive. See id. at
237-38 ("The continuing validity of this Court's observations in Allen are beyond
dispute, and they apply with even greater force in a case such as this, where the
charge given, in contrast to the so-called 'traditional Allen charge,' does not
speak specifically to the minority jurors.").

-18-

circuit, "[o]ne common elaboration of the [pure] <u>Allen</u> charge is to admonish the jury that it is unlikely that any other jury of superior ability, or better equipped than the jury now in the box . . . can be found").[7]

Other circuit courts have recommended the inclusion of certain cautionary language within the <u>Allen</u> charge. Some of the recommended cautionary language already existed in the pure instruction, for example: (1) that no juror should yield his or her conscientiously held convictions simply to reach an agreement; and (2) that the burden of proof belonged to the government, not the defendant. <u>See</u> <u>United States v. Flannery</u>, 451 F.2d 880, 883 (1st Cir. 1971) ("[T]he court should be careful to include all those elements of the original charge designed to ameliorate its coercive effect . . . ."); <u>see also</u> <u>Potter</u>, 691 F.2d at 1280 (same). Other cautionary language reflected the federal courts' worry that the pure charge unfairly singled out the minority. <u>See</u> <u>Flannery</u>, 451 F.2d at 883 ("Whenever a

_____

[7] There is some dispute among the circuits as to whether or not an <u>Allen</u> charge that omits the provision on the burden of proof is still proper. This court has, in at least one case, approved an instruction that did not include a reminder on the burden of proof. <u>See</u> <u>United States v. Rodriguez-Mejia</u>, 20 F.3d 1090, 1091 (10th Cir. 1994) (quoting the <u>Allen</u> instruction given). However, this court has also said that, when a district court provides an <u>Allen</u> instruction, it should safeguard against coercion by "again call[ing] the jury's attention to the presumption of innocence, the burden of proof, and the requirement that guilt must be established beyond a reasonable doubt." <u>Berger v. United States</u>, 62 F.2d 438, 440 (10th Cir. 1932); <u>see also</u> <u>Burrup v. United States</u>, 371 F.2d 556, 558 (10th Cir. 1967) (reiterating the same).

court instructs jurors to reexamine their positions, it should expressly address its remarks to the majority as well as the minority.").

Finally, as an exercise of their supervisory powers, several circuit courts have ruled that, any time a trial court directly encourages a unanimous verdict, a substitute charge containing certain cautionary language (in effect, a particular modified charge) must be given or the defendant's conviction should generally, if not automatically, be reversed. See Thomas, 449 F.2d at 1187 (D.C. Circuit); Fioravanti, 412 F.2d at 420 (Third Circuit); United States v. Brown, 411 F.2d 930, 933-34 (7th Cir. 1969) (Seventh Circuit).[8] Interestingly, these courts were likely motivated, at least in part, by a concern over the instruction's potential

---

[8] The Seventh and D.C. Circuits explicitly looked to the instruction recommended by the American Bar Association ("ABA") for guidance. See Brown, 411 F.2d at 933 ("We have concluded that it would serve the interests of justice to require . . . , in the future, district courts within this Circuit[,] when faced with deadlocked juries[,] [to] comply with the standards suggested by the American Bar Association's Trial By Jury publication."); Thomas, 449 F.2d at 1187 ("[W]e adopt the ABA standard for the guidelines which future renditions of Allen-type charges must abide, and the ABA approved instruction as the vehicle for informing jurors of their responsibilities in situations where judges decide to do so."). The ABA instruction is set forth in Appendix B.

The Committee on the Operation of the Jury System of the Judicial Conference of the United States approved of the ABA instruction with one addition. See Wright, supra, § 502, at 543 n.32. That addition was as follows: "[T]hat each juror who finds himself in the minority shall reconsider his views in the light of the opinions of the majority, and each juror who finds himself in the majority shall give equal consideration to the views of the minority." Id. (internal quotation marks omitted).

coercive effect, and yet they claimed to be motivated by considerations of judicial policy only. See Thomas, 449 F.2d at 1186 ("We are persuaded . . . by the volume and complexity of the litigation generated by the Allen charge, that its continued unrestricted use is incompatible with sound judicial administration."); Fioravanti, 412 F.2d at 420 & n.31 ("[T]he use of the Allen charge is an invitation for perennial appellate review.").

Oddly enough, soon after these Third, Seventh, and D.C. Circuit decisions requiring that cautionary language accompany an Allen instruction, the debate over the charge's validity tapered off dramatically, leaving for the federal courts the framework discussed above: in some courts, the pure charge still persists, though certain modified forms were recommended instead because of their inclusion of cautionary language, while, in other courts, the Allen charge has been formally replaced by a substitute charge, also containing cautionary language to ward off the potential for coercion. The Supreme Court, surveying the scene in the late 1980s, commented that, in spite of all the past controversy over the Allen instruction, "[a]ll of the Federal Courts of Appeals have upheld *some* form of [such] a charge." Lowenfield, 484 U.S. at 238 n.1 (emphasis added). Or, as the Fourth Circuit put it, "not a single one of the circuit[] [courts] has outlawed . . . instructions to juries for the purpose of inducing further deliberation and

agreement upon a verdict." United States v. Sawyers, 423 F.2d 1335, 1343 (4th Cir. 1970). This fact remains true today.[9]

C. Application of Allen Precedents to this Case

Allen instructions are often challenged on the grounds that: (1) the instruction should not have been given in the first place; and (2) the instruction was coercive. See Powell v. United States, 297 F.2d 318, 322 (5th Cir. 1962) ("Whether in any case the Allen charge should be given rests initially in the sound discretion of the trial judge. But the correctness of the charge must be determined by the consideration of the facts of each case and the exact words used by the trial court."). Here, Mr. McElhiney does not question the district court's decision to give an Allen charge, and we thus proceed to the second inquiry.

---

[9] For a review of the various circuit courts' positions on the Allen charge, see Bailey, 468 F.2d at 667-68. Though Bailey was decided almost forty years ago, the stance of the courts with respect to the instruction has not dramatically changed.

For pattern jury instructions on Allen charges, see 1st Cir. Pattern Jury Instruction §§ 6.03, 6.06 (1998 ed.); 5th Cir. Pattern Jury Instruction § 1.43 (1997 ed.); 6th Cir. Pattern Criminal Jury Instruction §§ 8.04, 9.04 (1991 ed.); 7th Cir. Federal Criminal Jury Instruction § 7.06 (1999 ed.); 8th Cir. Manual of Model Criminal Jury Instructions § 10.02 (2000 ed.); 9th Cir. Manual of Model Jury Instructions §§ 7.1, 7.7 (2000 ed.); and 11th Cir. Pattern Jury Instruction § 6 (1997 ed.).

With respect to the coerciveness of the charge actually given, this circuit has adopted a case-by-case approach, see Flannery, 451 F.2d at 883, considering such factors as "(1) [t]he language of the instruction, (2) its incorporation with other instructions; and (3) the timing of the instruction." United States v. Porter, 881 F.2d 878, 888 (10th Cir. 1989). The "colloquy between the judge and the jury foreman, [the] circumstances surrounding the giving of the instruction, and consideration of the American Bar Association Standards on Criminal Justice Relating to Trial by Jury" may also be relevant. United States v. Dyba, 554 F.2d 417, 421 (10th Cir. 1977). The ultimate question, however, is whether the Allen instruction was "impermissibly coercive in a way that undermined the integrity of the deliberation process."[10] Porter, 881 F.2d at 889; see also 75B Am. Jur. 2d § 1581, at 343 ("[T]he test effectively turns on a consideration of whether the court's instruction imposed such confusion or pressure on the jury to reach a verdict that the accuracy and integrity of the verdict returned becomes uncertain."); Note, Due Process, Judicial Economy & the Hung Jury: A Reexamination of the Allen Charge, 53 Va. L. Rev. 123, 136 (1967) ("Traditional

---

[10] Some circuit courts appear to have adopted a slightly different test. See Harris, 391 F.2d at 354 ("[An] Allen charge should be approved only so long as it 'avoids creating the impression that there is anything improper, questionable, or contrary to good conscience for a juror to cause a mistrial.'") (quoting Thaggard, 354 F.2d at 739).

analysis of the <u>Allen</u>-type instruction has adopted the language of prejudicial error.").[11]

As a preliminary matter,   we address the government's contention that we should reject Mr. McElhiney's <u>Allen</u> charge argument outright because the district court's comments were simply "observations" and not an instruction.  Aple's Br. at 43.  This contention seems calculated so as to sidestep any <u>Allen</u> charge analysis, and we find it unconvincing.

First, the district court did not simply provide "observations" as the government asserts; in making its comments, the district court directed the jury to

---

[11]  Unfortunately, even with these standards guiding our analysis, any <u>Allen</u> charge discussion is difficult because there are few consistent patterns in <u>Allen</u> charge case law, not only within this circuit but also without.  <u>See</u> <u>Fioravanti</u>, 412 F.2d at 416 n.19 ("Out of the plethora of cases researched, few consistent patterns have emerged, although some general condemnations of the <u>Allen</u> Charge have been proffered.").  Moreover, <u>Allen</u> charge analysis is always plagued by the fact that "[t]he coercive impact of an <u>Allen</u>-type instruction can almost never be proved," especially since the jury deliberation process is shielded from outside observation.  <u>Due Process</u>, 53 Va. L. Rev. at 135.  Even if a post-deliberation inquiry were made, it is highly unlikely that any juror would admit to having been coerced.

These difficulties alone might suggest that the Third, Seventh, and D.C. Circuits had the right of it in banning "pure"<u>Allen</u> charges and requiring, for the most part, strict adherence to a substitute charge containing certain cautionary language.  But as the Fifth Circuit lamented while attempting to address the problem of the <u>Allen</u> charge, "As a panel, . . . we are not free to ['reform' the <u>Allen</u> charge], for we can overrule [prior] Circuit cases only when we sit *en banc*."  <u>Bailey</u>, 468 F.2d at 668.

deliberate further, thus providing an instruction.  Second, the instruction given by the district court was "Allen" in nature: though "not like any Allen charge which we have faced before, it serve[d] the same purpose" (i.e., to encourage a unanimous verdict), "was given in an Allen situation" (i.e., a deadlocked jury), and was "fraught with the same . . . potential for coercion." United States v. Bass, 490 F.2d 846, 854 (5th Cir. 1974) (rejecting the government's argument that the following was not an Allen charge:  "If you have reached a verdict as to some Counts of the indictment, but not as to others, you may return a verdict as to those Counts.  On any count as to which you are not yet in unanimous agreement, I will ask you to return to the jury room and continue your deliberations."), overruled on other grounds by United States v. Lyon, 731 F.2d 243 (5th Cir. 1984).  Finally, even if the district court's comments did not constitute an instruction (Allen or otherwise), its remarks still had the potential to coerce the jury, and, as coercion is the primary concern with the giving of an Allen instruction, the overall Allen analysis would still be applicable.  In other words, the district court's comments would be examined under all the circumstances to determine whether the verdict reached by the jury was a product of impermissible coercion.  See 75B Am. Jur. § 1580, at 342 ("The propriety of particular *remarks* made by a judge to a jury after retirement for deliberation must be measured by the language employed, . . . and from the language used, a fair and reasonable conclusion must be deduced as to

-25-

the tendency to interfere with the exercise of the free and unbiased judgment of the jurors.") (emphasis added).

To summarize, the fact that district court's comments constituted a departure from the "typical" Allen charge does not mean that they are subject to no critical inquiry whatsoever. In our view, the Fifth Circuit took the proper approach in United States v. Cheramie, 520 F.2d 325 (5th Cir. 1975), explaining that:

> [i]t might be argued that the terse charge objected to here is so lacking in the elements composing either the . . . approved version or the original "Allen" cases that this Court should not subsume its analysis under the banner of the traditional "Allen" cases . . . . While this view presents an interesting definitional question, *the denomination of the charge is of only tangential importance.* Instead, we look to the language employed, and that language's impact, under the circumstances, on the finders of fact.

Id. at 330 n.3 (emphasis added).

We proceed then to the heart of the matter—whether the Allen instruction given by the district court was, as Mr. McElhiney argues, impermissibly coercive. For purposes of clarity, we note that technically two Allen instructions were provided to the jury: the first was given as part of the original jury instructions, see Rec. vol. II, doc. 312 (Instruction No. 36),[12] the second as a supplemental

_____

[12] The first instruction stated:

> It is the duty of the jury to reach a verdict if that can be done
> (continued...)

-26-

charge after the jury had reached an impasse. On appeal, Mr. McElhiney only

challenges the latter instruction. We conclude that, although the first instruction

was proper, the supplemental Allen charge, which neither incorporated the

language of the first instruction nor referred to it, was "impermissibly coercive in

a way that undermined the integrity of the deliberation process." Porter, 881 F.2d

at 889.

---

[12](...continued)
without violence to individual conscience. The verdict must be the
verdict of each juror and not a mere acquiescence in the conclusion
of others.

    If you fail to reach a verdict, the parties may be put to the
expense of another trial, and may once again have to endure the
mental and emotional strain of a trial. If the case is retried, a future
jury must be selected in the same manner and from the same source
as you have been chosen, and there is no reason to believe that the
case would ever be submitted to twelve men and women more
competent to decide this case than those of you who compose the
present jury. There is no reason to believe that there will be more or
clearer evidence produced at a future trial.

    I urge each and every one of you to listen to the opinions of
your fellow jurors as you review the evidence presented.

    However, I once again admonish you not to surrender your
honest conviction as to the weight of the evidence solely because of
the opinion of your fellow jurors, or for the mere purpose of
returning a verdict.

Rec. vol. II, doc. 312 (Instruction No. 36).

1.  Incorporation of the Allen Charge with Other Jury Instructions

In order to temper the potential coercive effect of an Allen charge, this court has recommended that the instruction be incorporated with the other jury instructions – in other words, that it be given as part of the original jury instructions.  See Smith, 857 F.2d at 684 ("The Tenth Circuit law permits the Allen charge *in toto* to be given, though with caution, and preferably . . . *before* the jury has reached an impasse or deadlock."); Potter, 691 F.2d at 1277 ("We have cautioned that the Allen instruction is preferred as part of the regular jury instruction before deadlock has occurred.").  In this position, the Allen instruction is less likely to be coercive because (1) it does not stand out or receive particular emphasis and (2) it is given before the jury has reached a deadlock.

In Mr. McElhiney's case, the Allen charge at issue was not incorporated with the other jury instructions, having been issued as a supplemental charge after the jury reached an impasse.  Consequently, the possibility of coercion becomes more likely.  We hasten to note that this positioning of the instruction does not by itself establish coercion.  See United States v. McKinney, 822 F.2d 946, 951 (10th Cir. 1987) ("[A]lthough it is a preferred rule of procedure that an Allen instruction be given the jury at the same time as other instructions, it is *not* a per se rule.").  But when this positioning is taken in conjunction with the flawed

-28-

language of the instruction, as discussed below, we conclude that there was impermissible coercion.

## 2.  Language of the Allen Charge

This court has emphasized that the language of a pure Allen charge "approaches the ultimate permissible limits of a [trial court's] prerogative to guide and direct a jury toward a righteous verdict."  Benscoter v. United States, 376 F.2d 49, 50 (10th Cir. 1967) (internal quotation marks omitted).  In the instant case, we do not have a pure instruction but rather a substantial deviation from it, an instruction that varies from the pure not only in terms of *omission* but also in terms of *embellishment*.  That the instruction here is a dramatic departure from the pure charge causes us much concern.  As noted by the First Circuit, a proper Allen instruction should "*include* all those elements of the original charge designed to ameliorate its coercive effect" and "*avoid* language which might heighten it."  Flannery, 451 F.2d at 883 (emphasis added); see also Potter, 691 F.3d at 1277 (same).

### a.  Omissions

We turn first to the omissions.  Notably, the Allen instruction in the supplemental charge lacked any of the cautionary language employed in the pure charge:  that no juror should surrender his or her conscientiously held convictions

-29-

and that the burden of proof belonged to the government, not the defendant. While we are troubled by the omission of the latter, we recognize that this court has, in at least one prior case, approved of an Allen instruction that did not include a reminder as to the burden of proof. See Winn, 411 F.2d at 417 (noting the trial court's "failure to remind the jury that the defendants were presumptively innocent and the Government had the burden of proving them guilty beyond a reasonable doubt" but concluding, upon reviewing the instruction as a whole, that "[w]e cannot say the words used were reversibly coercive"). The same, however, cannot be said with respect to the other cautionary language employed in a pure Allen charge.

This court has never, at least not to our knowledge nor in any of the cases supplied by the government, approved of an Allen charge that failed to incorporate an admonition regarding the juror's conscientiously held convictions.[13] A review of Tenth Circuit case law explains why. Repeatedly, this

_____

[13] Our research reveals that the closest case to an exception is United States v. Winn, 411 F.2d at 416. But significantly, in Winn, although the court did not provide the cautionary language in the written instruction, it orally presented *other* cautionary language that served to temper the coercive effect of the Allen charge. Chief Judge Murrah noted that "we have said more than once that an instruction of this kind would be more appropriately influential and far less vulnerable to the charge of coercion if given before the jury initially retires." Id. (internal quotation marks omitted). However, he added that the charge could be supplementally given "provided the jury is given to understand they are not required to give up conscientiously held convictions." Id. (internal quotation

(continued...)

-30-

court has stated that its approval of the <u>Allen</u> charge's use was predicated on the inclusion of that admonition. As Chief Judge Murrah stated in <u>Elbel v. United States</u>, 364 F.2d 127 (10th Cir. 1966): "We have cautiously approved the so-called <u>Allen</u> instruction even when made to an apparently deadlocked jury, *provided* the jury is made to understand that [it is] free to follow [its] conscientiously held convictions." <u>Id.</u> at 135-36 (emphasis added).

Notably, this court's most recent <u>Allen</u> charge cases have adhered to Chief Judge Murrah's words – upholding the <u>Allen</u> instructions given largely because they contained the proper cautionary language. <u>See</u> <u>United States v. Arney</u>, 248 F.3d 984, 988 (10th Cir. 2001) ("Although the district court emphasized that a verdict was 'very desirable' and expressed an opinion that the case could not be tried better by either side, the remainder of the instruction properly and clearly emphasized that no 'juror should surrender his or her conscientious convictions' and that each juror should consider his or her opinion 'with a proper regard and deference to the opinion of [the others].'"); <u>Rodriguez-Mejia</u>, 20 F.3d at 1092 ("[T]he court emphasized in this case that the jurors should not surrender their honest convictions."); <u>Porter</u>, 881 F.2d at 889 ("Here, although the judge did state

---

[13](...continued)
marks omitted). He observed that the trial judge had explained that principle to the jury. <u>See</u> <u>id.</u> at 417 (noting that the trial court informed the jury that "'the Court never wants to force a verdict of any kind under any circumstances and that would be wrong'").

-31-

his opinion that the case could not have been 'tried better or more exhaustively than it has been on either side,' the remainder of the instruction properly and clearly emphasized that no 'juror should surrender his or her conscientious convictions' . . . .").

This court is not alone in finding the admonition on conscientiously held convictions to be of great import. See Due Process, 53 Va. L. Rev. at 28 ("Almost without exception the courts have required that the charge contain the statement that 'no juror should yield his conscientious conviction' or words to that effect."). According to the Second Circuit, "[A] necessary component of any Allen-type charge requires the trial judge to admonish the jurors not to surrender their own conscientiously held beliefs." Smalls v. Batista, 191 F.3d 272, 279 (2d Cir. 1999). Similarly, the Fourth Circuit has commented that an Allen instruction "stripped of its complementary reminder that jurors were not to acquiesce in the views of the majority or to surrender their well-founded convictions conscientiously held . . . might readily be construed by the minority of the jurors as coercive," Rogers, 289 F.2d at 435; the Sixth Circuit has said that the admonition is "one of the most important parts of the Allen charge," Scott, 547 F.2d at 337; and the Ninth Circuit has stated that "[i]t is essential in almost all cases to remind jurors of their duty and obligation not to surrender

conscientiously held beliefs simply to secure a verdict for either party." United States v. Mason, 658 F.2d 1263, 1268 (9th Cir. 1981).

Given the significance of the admonition on conscientiously held convictions, its omission cannot be condoned. See Rogers, 289 F.2d at 436 (noting that, if slight additions can convert a proper charge into a prejudicial and erroneous one, "how much more objectionable it is if the reminder that makes the Allen charge tolerable in the first place is omitted altogether"). Because of the omission in this case, the coercive effect of the Allen instruction was substantially heightened.

### b. Embellishments

Were we confronted by the omission of cautionary language only, we would have before us a closer case. But here the instruction was not only problematic because of its omissions but also because of its embellishments. There are two embellishments deserving of special attention in the case at hand.

First, the district court repeatedly emphasized the desirability of a verdict and the court's desire to have a verdict reached. It noted at various points that "we'd like to have a verdict in this case, that's the situation," Tr. at 2-3; "[w]e may be doing this again and that's the reason I'd be very happy to have a verdict

-33-

one way or the other," id. at 5; and "[w]ell I—frankly, the Court would certainly like to have you try to reach a verdict in this case." Id. at 6 (emphasis added).

These statements by the district court that it wanted a verdict might all too easily have led the jury to think it more important to achieve unanimity to please the district court rather to remain true to its honest beliefs—especially in the absence of the admonition on conscientiously held convictions. That the district court did not express a desire for a particular verdict does not affect our analysis. Simply because the district court did not favor one verdict over another does not mean the jury was not pressured, even if only inadvertently, into reaching a verdict instead of remaining deadlocked.

The district court's second embellishment—its statement about expense and danger—is also troubling. As noted above, the district court stated to the jury, "I have received a note from the jury here that is very distressing to me because this has been one of the greatest major efforts made in time and attention and money that I have noted in my 24 years as being a judge." Tr. at 2. Subsequently, it pointed out to the jury, "[T]he time and attention and the danger of this case has been, you know, a problem. We've had security here that was just – I said to somebody we could have fought the Russian Army head on with what we've had here in this case." Id. at 6.

While this court has in prior cases approved of <u>Allen</u> instructions that discuss expense, <u>see</u> <u>Rodriguez-Mejia</u>, 20 F.3d at 1091 (holding that an <u>Allen</u> charge, which included the statement that "[t]he trial has been expensive in time, effort[,] and money to both the defense and the prosecution," was not coercive), we do not accept the proposition that a comment on expense is always noncoercive. Instead, we agree with the Ninth Circuit's conclusion that the addition of a comment on expense does not "*necessarily*" make a charge more coercive but that it *can*. <u>Mason</u>, 658 F.2d at 1267 (emphasis added); <u>see also</u> <u>id.</u> ("This court has long recognized that injection of fiscal concerns into jury deliberations has potential for abuse."). In Mr. McElhiney's case, we note that the district court did not make a simple reference to the expense of another trial (as, for example, in <u>Rodriguez-Mejia</u>); rather, the issue of expense was underscored, the district court stating, "[T]his has been one of the greatest major efforts ever made in time and attention and money that I have noted in my 24 years as being a judge." Tr. at 2. Furthermore, the district court characterized this situation as being "very distressing to me." <u>Id.</u>; <u>see also</u> <u>Harris</u>, 391 F.2d at 354 (noting that "the judge's statement in regard to the expense and burden of conducting a trial" is a "questionable extension" of the <u>Allen</u> charge, "especially where this factor is unduly emphasized").

-35-

The district court's elaboration on expense, however, was not as problematic as its comment on danger. While a comment on expense has at least the potential to be innocuous, the same cannot be said of a comment on danger. Danger, unlike expense, is a loaded term, one more likely to catch a jury's attention and one more likely to prod the jury to action (i.e., unanimous agreement).

In denying Mr. McElhiney's motion for a new trial, the district court discounted the effect of its remark by noting that the danger was obvious to the jury:

> [T]hese facts were well-known to the jury . . . . There were nineteen inmate witnesses. Every inmate witness . . . wore ankle chains in court. These were inmates who had served or were serving time in maximum or super-maximum security institutions. The serious criminal histories of some of these inmates were discussed. A violent prison murder . . . was a matter frequently discussed. Fear and retribution were common topics. Several times there was a tense atmosphere in the courtroom during cross-examination of adverse witnesses. There were numerous security personnel inside and outside the courtroom. None of this could have gone unnoticed by the jury.

Order at 10. In all likelihood, the district court was correct in stating that the danger could not have gone unnoticed by the jury. However, it is one thing for a jury to be cognizant of a fact and another for a court to draw attention to that fact, especially when the subject matter is so sensitive and the characterization so negative.

-36-

### 3. Timing of the Allen Instruction

Because of the failure to incorporate the Allen charge with the other jury instructions and the flawed language employed in the instruction (the omission *plus* the embellishments), our confidence in the integrity of the deliberation process has been substantially undermined. In spite of these considerations, the government still argues that the jury's verdict was not a product of coercion because of the timing of the instruction, that is, the length of deliberations after the Allen charge was issued. We cannot agree.

As a preliminary matter, we note that the record does not support the government's contention that the jury deliberated for six hours after having received the supplemental Allen charge. All that is known is the following: (1) The jury first informed the district court of the deadlock at approximately 10:30 a.m.; (2) at some point, the jury was called into the courtroom during which the district court asked it to deliberate until noon; (3) at 12:17 p.m., the jury sent a second note to the district court, asking to review some evidence; (4) the jury shortly thereafter had its lunch break; (5) at 1:50 p.m., the jury sent yet another note to the district court, again asking to reconsider more evidence (i.e., a readback of Mr. Hawley's testimony); (6) the readback did not take place for another two hours; (7) the readback lasted for an hour; and (8) ten minutes after the readback – i.e., at 5:00 p.m. – a verdict was returned.

The record does not reveal such facts as (1) precisely when the jury began its deliberations after receiving the Allen charge; (2) how long the lunch break lasted; and (3) whether the jury deliberated during the time the readback was being prepared for their reconsideration (i.e., from 1:50 p.m. to 3:50 p.m.). Given these missing facts, we estimate that, in the very best case scenario – itself unlikely – the jurors could only have deliberated for four hours (from 10:30 a.m. to 12:17 p.m., from 1:50 p.m. to 3:50 p.m., and from 4:50 p.m. to 5:00 p.m.), and, in the worst case, for one-and-a-half hours (from 10:30 a.m. to 12:17 p.m. and from 4:50 p.m. to 5:00 p.m.).

The government points out, however, that in prior cases this court has approved Allen charges in which the timing was as short as an hour and twenty minutes. See, e.g., McKinney, 822 F.2d at 950 (noting that "the district court gave the jury a full-fledged Allen instruction" after which "[t]he jury again resumed its deliberation, and an hour and twenty minutes later returned a unanimous verdict"); see also United States v. Butler, 904 F.2d 1482, 1488 (10th Cir. 1990) (stating that two hours after the Allen charge was given the jury returned a verdict of guilty). But see Due Process, 53 Va. L. Rev. at 133 (noting that there are no consistent standards when it comes to timing – i.e., some courts have affirmed a verdict in instances in which the jury deliberated for only a short time after receiving an Allen instruction while other courts have reversed).

-38-

The government is correct in noting the timing of these cases. But what the government fails to recognize is that, in these cases, the trial court did not employ any faulty language, certainly none comparable to the case at hand. Most importantly, in these cases, the trial court did not omit the all-important cautionary language that the jurors should not yield any convictions conscientiously held simply to reach a verdict. See McKinney, 822 F.2d at 950 (noting that the Allen charge "admonished the jurors not to yield any conscientious convictions they may have as to the weight or the effect of the evidence"; also stating that the charge contained cautionary language "remind[ing] the jurors that they must acquit the defendant if the evidence failed to establish guilt beyond a reasonable doubt"); Butler, 904 F.2d at 1488 (noting that Allen charge instructed jury that "no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence" and that "it is your duty to agree on a verdict if you can do so without surrendering your conscientious conviction"; also noting that instruction contained cautionary language reminding jury of the burden of proof).

Given this distinction, we cannot place much stock in the cases on which the government relies. Instead, we look to cases such as Smalls and Mason. In both of these decisions, the timing of the instruction did not overcome the coerciveness arising from the flawed language of the charge. See Smalls, 191

-39-

F.3d at 281 ("[T]he jury charge . . . lacked any such cautionary language and failed to inform the jurors of the possibility that they could remain deadlocked rather than surrender their conscientiously held beliefs. The length of deliberations in this case did not diminish the coerciveness of the supplemental jury charge."); Mason, 658 F.2d at 1265 (noting that the jury did not return a verdict until an hour and a half after the Allen instruction but ultimately concluding that the instruction was impermissibly coercive).

Finally, we are not convinced by the government's argument that, because the jury deliberated beyond noon in response to the district court's suggestion of an additional deliberation period until noon, the Allen charge had no coercive effect. We agree with the government to the extent that, if the jury had rendered its verdict by noon in these circumstances, there would be a strong argument that the jury was coerced.

In fact, cases such as Burroughs v. United States, 365 F.2d 431 (10th Cir. 1966), and Goff v. United States, 446 F.2d 623 (10th Cir. 1971), suggest that setting a time deadline exacerbated the coercive effect of the Allen charge. We point to this court's comments in Burroughs:

> [I]t is one thing to recall the jury to beseech them to reason together, and it is quite another to entreat them to strive toward a verdict by a certain time. When these admonitions are considered in their context, they are subject to the clear inference that the judge was unduly anxious to conclude the lawsuit, and we think it entirely reasonable to infer that the jury was aware of his anxiety. This type

of verdict-urging on the part of the court tends to undermine the
proper function of the common law jury system . . . .

365 F.2d at 434.  To put the matter more succinctly, "[a] court's attempt to secure

[a] quick verdict prevents fair and thoughtful deliberation by [a] jury."  75B Am.

Jur. 2d § 1601, at 367-68; see also Flannery, 451 F.2d at 883 (criticizing the trial

court for suggesting to the jury that "it was more important to be quick than to be

thoughtful"); Goff, 446 F.2d at 626 (concluding that "[i]t was impermissibly

suggestive and coercive for the Court to place a time fuse [i.e., a deadline] on the

period of jury deliberation").


### 4.  Other Considerations

These factors indicate that the Allen instruction in the instant case was

impermissibly coercive.  A few final considerations support that conclusion.

First, this court has endorsed the ABA version of the Allen charge, see note 8,

supra, and suggested that, in determining the coercive effect of a particular

instruction, we compare that instruction to the ABA version.  See Dyba, 554 F.2d

at 421.  A comparison with the ABA version highlights that the charge in the

instant case was plagued by problematic language – not only the omission of all

cautionary language, particularly that dealing with conscientiously held

convictions, but also embellishments on expense and danger.

Second, at least one circuit court has noted that the fact of a prior hung jury may under certain circumstances strengthen the inference of coercion.  See Bailey, 468 F.2d at 665 (observing that "[t]he special concurrence in Thaggard v. United States[,] [354 F.2d at 735,] thought it 'significant that there had already been one hung jury in a previous trial'").  We agree.  The fact that the jury in Mr. McElhiney's first trial could not reach a verdict contributes to the coercion calculus.

Finally, and perhaps most importantly, we take note of the colloquy between the foreperson and the district court.  As the Appendix reflects, the foreperson repeatedly told the district court – at least three times – that the jury was at an impasse, see, e.g., Tr. at 3 ("[W]e have exhausted all possibilities that would help us reach a verdict."), and all the jurors, when individually polled, agreed.  Deliberations resumed only after strong pressing by the district court, with the foreperson finally acquiescing by saying, "I would be willing to try [more deliberations] *if that is your wish*."  Id. at 5 (emphasis added).

All this is not to say that the evidence of coercion is entirely clear-cut in this case.  Indeed, there is one fact that does give us some pause:  that, before reaching a verdict, the jury reconsidered two pieces of evidence.  The government argues that this fact demonstrates that the verdict was not a product of coercion but rather a result of the jury's reexamination of evidence.  See United States v.

-42-

Ajiboye, 961 F.2d 892, 894 (9th Cir. 1992) ("Indeed, the jury asked for some of the trial testimony to be re-read before reaching its verdict – another pretty good indication that the Allen charge did not coerce the guilty verdicts.").  While we believe that this fact does weigh in the favor of the government, we cannot say that, given *all* of the factors above, we do not have substantial doubts as to the integrity of the deliberation process, see Porter, 881 F.2d at 889 (asking whether the Allen charge was "impermissibly coercive in a way that undermined the integrity of the deliberation process"); Thomas, 449 F.2d at 1184 (asking if there was "a substantial probability of prejudice to the accused"), especially since the foreperson insisted during the colloquy with the district court that "added work" and "read backs" would *not* assist the jury in reaching a verdict.  Tr. at 3; see also Smalls, 191 F.3d at 281-82 (noting that the jury reexamined evidence before reaching a verdict but ultimately concluding that the Allen charge was still impermissibly coercive).  Taking into account the totality of the circumstances, and, cognizant of this circuit's guideline that even a pure charge borders on the impermissible – a corollary of which is that a substantial deviation is highly questionable – we cannot but say that the instruction given in the instant case managed to cross that boundary.

To conclude, we hold that Mr. McElhiney's conviction must be reversed because, given the specific facts confronting us, and in particular, the faulty

-43-

language employed, the Allen instruction provided was impermissibly coercive. We emphasize that our holding here is dictated by the unique circumstances in the case at hand. Cf. Mason, 658 F.2d at 1266 (stating that "we must give close scrutiny to the actual charge and the circumstances in which it was given," particularly because "an Allen error calls into question the validity of a jury's verdict, upon which substantial appellate presumptions rely").

Undoubtedly, this was a difficult case, made more so by the problem of a pro se defense. It may be that, because of these difficulties, the district court did not realize that it was in an Allen situation. Further, we are not without sympathy for the concerns of the district court, namely, the possibility of a third trial involving considerable expense. However, we must caution that exhorting a deadlocked jury to further deliberation—the classic Allen scenario—must be undertaken with great care. See Rodriguez-Mejia, 20 F.3d at 1091 (stating that "[w]e have traditionally urged caution in the use of the Allen instruction") (citing Butler, 904 F.2d at 1488); Smith, 857 F.2d at 684 (noting that the Allen charge must be given "with caution"); see also Flannery, 451 F.2d at 883 ("Like dynamite, [the Allen instruction] should be used with great caution, and only when absolutely necessary."). When a district court issues an instruction encouraging a unanimous verdict, the following cautionary language should be incorporated to balance the potential coercive effect of the charge: (1) that no

-44-

juror should relinquish his or her conscientiously held convictions simply to secure a verdict and (2) that every individual juror should reconsider his or her views, whether in the majority or in the minority.  Cf. United States v. Munroe, 424 F.2d 243, 246 (10th Cir. 1970) ("[W]e believe that . . . the [ABA] Jury Trial Standards discussed above [see note 8, supra] provide proper safeguards against the possible taint of coercion from the giving of supplemental jury instructions."). As a final note, and recognizing that we have upheld an Allen instruction not containing the burden of proof, Winn, 411 F.2d at 417, this cautionary language should be supplemented with a reminder to the jury of the burden of proof, once again to avoid the possibility of coercion.  See Burrup, 371 F.2d at 558 (Chief Judge Murrah stating that "the judge cannot be too careful to remind the jury of these prerequisites to full and fair consideration of the guilt or innocence of an accused," including "the requirement that guilt must be established beyond a reasonable doubt") (internal quotation marks omitted).

IV.  CONCLUSION

Having reviewed the briefs and the record submitted by the parties, we conclude that no Brady violations occurred but that the supplemental Allen charge

was impermissibly coercive. Accordingly, we REVERSE and REMAND to the district court for proceedings consistent with this opinion.[14]

---

[14] In light of our disposition of Mr. McElhiney's challenge to the <u>Allen</u> charge, we do not address the other issues he raises in this appeal.

APPENDIX A (The District Court's <u>Allen</u> Charge)

Court: Let the record disclose we're all present. And ladies and gentlemen, I have received a note from the jury here that is very distressing to me because this has been one of the greatest major efforts ever made in time and attention and money that I have noted in my 24 years as being a judge. And I need to find out whether this jury is – feels like you cannot continue. Your note says, "The jury is unable to reach a verdict." My question needs to be, I cannot dismiss a jury unless I am – and declare a mistrial, unless I can be assured that the jury is hopelessly deadlocked. It's not sufficient that you're currently deadlocked under the law. And let me first talk to the foreperson. And is it your position that the jury cannot reach a verdict?

Foreperson: Yes, Your Honor.

Court: And has there been any change in the last hour or two or where are we here?

Foreperson: There has been no change in the last hour or two.

Court: Has there been a change since yesterday?

Foreperson: Yes.

Court: Well, it is your position that added work would not bring about a verdict? Regardless of which way the verdict goes, we'd like to have a verdict in this case, that's the situation.

Foreperson: We understand that. It is my position that we aren't able to come up with a verdict.

Court: And do you think you've exhausted all possibilities of any read backs that would help you reach a verdict or anything like that?

Foreperson: Yes.

Court: What does that mean?

Foreperson: Yes, we have exhausted all possibilities that would help us reach a verdict.

Court: Well, let me – let's poll the jury here and would you simply ask them a general question of each one of them of whether they think there's any possibility of any change. I think you have a question there, perhaps that you can ask.

Clerk: Lisa McClendon, is it your decision that you cannot reach a verdict?

Juror: Yes, it is.

Clerk: Katherine Priest, do you feel you cannot reach a verdict?

Juror: Yes, it is.

Clerk: Derron Dean, do you feel you cannot reach a verdict?

Juror: Yes.

Clerk: Steven Booth, do you feel you cannot reach a verdict?

Juror: Yes.

Clerk: Frances Oliva, do you feel you cannot reach a verdict?

Juror: Yes.

Clerk: Beth Blackwell, do you feel you cannot reach a verdict?

Juror: Yes.

Clerk: Diana Dittman, do you feel you cannot reach a verdict?

Juror: Yes.

Clerk: Billy Hagen, do you feel you cannot reach a verdict?

Juror: Yes.

Clerk:          Janice Stone, do you feel that you cannot reach a verdict?

Juror:          Yes.

Clerk:          Rebecca Frye, do you feel you cannot reach a verdict?

Juror:          Yes.

Clerk:          Christie Appelhanz, do you feel you cannot reach a verdict?

Foreperson: Yes.

Clerk:          And, Mark Jones, do you feel you cannot reach a verdict?

Juror:          Yes.

Court:          Do you all think that if you deliberated until noon, it would not make any – there would be no change, is that your general consensus, is that what you think?

Foreperson: I would be willing to try if that is your wish.

Court:          Well, frankly, I'd like to have you do this. Of course, I do not know what will happen from now on out. I have no control over that. But we may be doing this again and that's the reason I'd be very happy to have a verdict one way or the other. And it's – but the time and attention and the danger of this case has been, you know, a problem. We've had security in here that was just – I said to somebody we could have fought the Russian Army head on with what we've had here in this case.

                Well, I – frankly, the Court would certainly like to have you try to reach a verdict in this case. And why don't you continue your deliberations for a while and see if there's any possibility you can reach a verdict in this case. Are you willing to do that?

Foreperson: I am, yes.

Court:          All right. Well, why don't we recess then and you continue to try to deliberate. And if you find that you're absolutely hopelessly

-49-

deadlocked, why then I would have nothing else I can do except dismiss you with the thanks of the Court. But why don't you give it another try. Mr. Bailiff.

(Thereupon, the following proceedings were had out of the hearing of the jury panel.)

Court:        Mr. McElhiney.

McElhiney:    Your Honor, I'm concerned about the use of the word "danger" just now. That might be interpreted – it could have coerced the jury into thinking they must reach a verdict without explanation of that. This is a prison case, there's been a lot of newspaper publicity and using the word "danger" like that, I didn't understand the context.

Court:        Well, I'm sure the jury understands that with all the people we've had here that this has been a very difficult case to try. And so I do not feel that there's anything there that's going to turn a verdict one way or the other.

McElhiney:    For the record, I would request a mistrial based on what the jury has said.

Court:        Your motion will be overruled and denied. Mr. Bailiff, let's recess the Court.

## APPENDIX B (ABA's Recommended <u>Allen</u> Charge)

(i)   [T]hat in order to return a verdict, each juror must agree thereto;

(ii)  [T]hat jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) [T]hat each juror must decide the case for himself or herself but only after an impartial consideration of the evidence with the other jurors;

(iv)  [T]hat in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change an opinion if the juror is convinced it is erroneous.

(v)   [T]hat no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of the other jurors, or for the mere purpose of returning a verdict.

<u>ABA Standards for Criminal Justice</u> § 15-5.4 (3d ed. 1996).