**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 15 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RODNEY DUANE CANTWELL,

Defendant - Appellant.

No. 01-4171

(D. Utah)

(D.C. No. 2:98-CR-104-B)

**ORDER AND JUDGMENT** *

Before **HENRY** , **PORFILIO** , and **ANDERSON** , Circuit Judges.

Rodney Cantwell appeals his conviction by a jury on one count of mail

fraud in violation of 18 U.S.C. § 1341, one count of wire fraud in violation of 18

U.S.C. § 1343, and aiding and abetting, in violation of 18 U.S.C. § 2. We affirm.

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

# BACKGROUND

Cantwell was the founder and president of Eagle Resources, a business located in Salt Lake City, Utah. Christie Cantwell, Rodney Cantwell's wife, testified that he "was in charge of [the] operation . . . [f]rom top to bottom[] . . . [d]ay in and day out[.]" Appellant's App. I at 237. Cantwell and Eagle Resources used videotapes and brochures to solicit participation in its program ("Program"), which it called " The Business Opportunity of the 21st Century." Appellant's App. II at 543.

The Program offered two options: the Basic Program and the Premier Business Development Program. Participants in the Basic Program paid a $220 fee and, in turn, received registration in the program, valued at $25; the Basic Development Package, valued at $50; and five Silver Eagle Coins, valued at $145.[1] The Basic Program included fifty postcards, five brochures, and an Eagle Resources Opportunity Video. It also offered a 30-day money back guarantee for the coin purchase.

The Premier Business Development Program required a $715 fee. This program provided additional marketing materials, including 500 fold-out mailers,

---

[1]The brochures which Eagle Resources sent to prospective participants in its Program stated that the coins "are the same coins sold wholesale at $6-$8 and retail for $25-$35." Appellant's App. II at 532. There was similar testimony at the trial concerning the value of the coins.

five brochures and the Eagle Resources Opportunity Video. The Premier Program contained a "6 month 100% Money Back Performance Guarantee!"      Id. at 547.

A brochure describing the Program to prospective participants described how Cantwell had "spent years developing a revolutionary, unparalleled and ingenious marketing plan he called THE LINEAR PAY PROGRAM."      Id. at 543. The brochure further stated that participants could receive a total of $27,080 after thirty weeks, [2] and stated that, if they joined the Program, they would "work less, and accumulate significantly more cash and silver coins without having to talk to anyone!"   Id. at 547.  The brochure stated that the Eagle Resources Program enabled participants to "duplicat[e] [their] efforts" by "making money by multiplying [their] time with the time of others."      Id. at 543.  Another brochure sent by Cantwell to a participant described the Eagle Resource Program as requiring "[n]o individual selling. . . . Your Business Growth is realized from your Bonuses and the Bonuses of your Customers.  This is the tripling effect of Eagle Resources."   Id. at 531 (original emphasis omitted).  It further stated, "Immediately upon receipt of your $50 we will mail FIFTY POSTCARDS with your name as sponsor.  The customers generated by this mailer will build your income."   Id. at 532 (original emphasis omitted).

---

[2]The 30-week total of $27,080 contained a disclaimer that "[t]he income[] shown above [is] not guaranteed.  Your income depends upon your own efforts and the actual response to your mailings."  Appellant's App. II at 544.

The Eagle Resources Opportunity Video consisted of Cantwell explaining how the "Linear Pay Program" worked. A brochure described it as follows:

> You begin by simply purchasing five (5) one-ounce uncirculated American Eagle Silver Bullion Coins from EAGLE RESOURCES for only $145. Upon receipt of the $145 and the enclosed application form, you will be entered into our LINEAR PAY PROGRAM.™ The 5 Silver Eagles will be shipped to you within 7 days from our receipt of your purchase agreement.
>
> . . . .
>
> For each Direct Sale of 5 Silver Eagle coins, a commission of $18 will be paid plus 1 Credit given. For each 2nd Generation Direct Sale, a commission of $6 will be paid plus 1 Credit given. For each 3rd and 4th Generation sale, a commission of $3 will be paid with no Credits given.
>
> When you accumulate twelve (12) Credits, the LINEAR PAY PROGRAM™ will pay you a Bonus Commission of fifteen (15) Silver Eagle coins, which represents three new entries on the line.
>
> Every time anyone on any of your 4 Generations earns 12 Credits and receives a Bonus Commission, you earn a commission. You earn $54 on your 1st Generation, $18 on your 2nd Generation, and $9 on your 3rd and 4th Generations–all automatically!

Id. at 534.

Counts V and VI of the indictment against Cantwell involved Carlo Pessalano, a resident of Jacksonville, Florida. He first learned of Eagle Resources in 1993 after receiving a letter from a Program participant. Appellant's App. I at 105; Appellant's App. II at 603-04. He subsequently received a letter dated June 10, 1993, from Rodney Cantwell, enclosing a brochure describing the Linear Pay Program. Pessalano then mailed to Eagle

Resources a check dated June 24, 1993, in the amount of $195, as payment for the Basic Program. Appellant's App. II at 606.

Cantwell sent Pessalano a welcome letter dated July 7, 1993, enclosing five Silver Eagle coins, brochures and marketing materials, and the Eagle Resources Opportunity Video. Id. at 607-08. On September 8, 1993, Eagle Resources sent to Pessalano additional promotional materials, including a brochure. Pessalano testified that the representations in the brochure persuaded him to join the Premier Business Development Program. Appellant's App. I at 123-24. He testified that he was particularly influenced by the representation that he could make more money in a month than most people make in a year and that he could make money without talking to anyone. On September 16, 1993, Pessalano sent another check by certified mail to Eagle Resources, in the amount of $715. Appellant's App. II at 611.

Pessalano subsequently received another letter from Cantwell, along with five more Silver Eagle coins, 500 Eagle Resources mailers, and additional marketing materials. One of the enclosed materials indicated that Pessalano could request supplemental mailings in the event he received five or fewer responses to his mailers. Id. at 561, Appellant's App. I at 116. Pessalano requested such supplemental mailings, but never received them. Appellant's App. I at 117.

In December 1993, Pessalano called Eagle Resources' toll-free number and spoke to a woman named Felicia about obtaining a refund for his Premier Business Development Program package. Appellant's App. II at 616. Felicia told Pessalano to return all the materials he had received from Eagle Resources and she would immediately send him a refund. Pessalano mailed his refund request on March 23, 1994. Id. at 552, 613. He then received from Eagle Resources a letter dated March 23, 1994, which listed the names of people who had contacted Eagle Resources in response to Pessalano's mailings. Id. at 555, 615. When Pessalano again called Eagle Resources' toll-free number, he was told that the government had seized Eagle Resources' records and the company could therefore not act upon his refund request. Pessalano never received a refund.

In total, approximately 6100 people participated in the Eagle Resources Program between September 1990 and January 1994. Appellant's App. I at 211, 221. During this time period, approximately $2 million was received by Eagle Resources. Id. at 191.

On February 27, 1998, the government indicted Cantwell on seven counts of mail fraud and seven counts of wire fraud. Five of the fourteen counts were dismissed during the course of the trial. Appellant's App. II at 623. [3] After a five

---

[3]Four of the counts dismissed related to two witnesses who did not appear. The fifth involved a person who lived in Utah and never spoke by phone with
(continued...)

day trial, the jury found that Cantwell had used the United States mail and interstate wire communications to defraud Pessalano, and accordingly found Cantwell guilty of counts V and VI. The jury found Cantwell not guilty on the remaining seven counts. He was sentenced to 37 months imprisonment, followed by 36 months of supervised relief. This appeal followed.

## DISCUSSION

Cantwell raises four issues on appeal: (1) whether the district court erred in failing to dismiss the entire jury panel for cause based on responses made by some members of the panel during voir dire; (2) whether the district court erred in allowing expert testimony as to the nature of a pyramid scheme, even though Cantwell was not charged in the indictment with operating a pyramid scheme; (3) whether there was sufficient evidence supporting the guilty verdict beyond a reasonable doubt; and (4) whether the district court erred in giving an Allen charge to the jury when it informed the court that it could not reach a verdict.

---

[3](...continued)
Cantwell or any other Eagle Resources person, and for whom the interstate communication element of the wire fraud count was apparently not satisfied.

**I. Voir Dire**

During jury voir dire, three prospective jurors indicated they had heard previously of Cantwell and Eagle Resources. The first prospective juror, Mr. Mooy, an attorney, stated that when he worked at the Utah Attorney General's office in 1992 or 1993, "part of the work [he] did . . . involved some state examination of the activities that are alleged." Appellant's App. I at 56. When asked how he "would feel sitting in judgment here of the facts as a juror in this case," id. at 57, Mooy responded, "I believe I can distinguish what I learned or the information that I can recall from that time to what would be presented in the court today. I believe I would be able to do that." Id. The court then inquired, "Do you think you would be able to be impartial and weigh this evidence here fairly and impartially without having a preconceived notion of whether the defendant's activities were criminal or not?" Id. Mooy responded, "[t]hat may be difficult from what I recall." Id. The court then moved on to question the other two prospective jurors who indicated some familiarity with Cantwell and Eagle Resources.

The second such prospective juror, Mr. Jensen, described what he had heard about the case as follows: "Oh, just friends of mine had just heard of Eagle Resources from back in '92 and just synonymous with pyramid organizations. Sorry, but we kind of made fun of it." Id. The court promptly dismissed Jensen.

The final prospective juror was Ms. Scott, who stated, "We had several friends and acquaintances approach us about this pyramid business. We did not get involved with it, but they did and they did lose money." Id. at 58. When asked how that experience affected her, and whether she had "form[ed] a negative opinion or a positive opinion about this company based on your exposure to it through [her] friends," Scott responded, "I can't say that I formed an opinion either way. I just know that they were very bitter and we heard some real negative stuff from [our friends]." Id. at 59. The court also promptly dismissed Scott from the jury pool.

After jury voir dire was completed, and out of the presence of the jury, the court dismissed Mooy. Cantwell's defense counsel thereupon moved to excuse the entire jury panel for cause based upon the comments of Mooy, Jensen, and Scott. Id. at 89. The court denied the motion, id. at 90, explaining as follows:

> I don't think from what we have heard here that there is anything that is going to so obviously taint the jury as to require us to start over again. Any comments that were made were extremely limited and were cut off before they went into any detail that I felt was going to prejudice the defendant. The fact that a few of the prospective jurors had heard something about this and mentioned what they did during the voir dire process was just not sufficient in my view to even come close to declaring a mistrial and excusing this panel and starting over again. I will give [a] limiting instruction, however. . . .

Id. at 90-91. The court accordingly gave the following limiting instruction to the entire voir dire panel:

I also want to make sure that you all understand one thing. Some comments were made during this voir dire process we call it, this selection process, about things that people had heard and people had learned about the defendant and more particularly the defendant's business. Some of the things that were said may have been slightly negative in tone, and there were some suggestions that maybe some money was lost and people were not happy about it. I want all of you to know, and some of you will be on the jury, that those comments may not be used or taken into account in any way by the jury in this case. They were stated in response to questions by the Court during the selection process and they are not to be used in deliberating on this case anymore than anything else that you may have seen or heard that did not come in through the evidentiary process that we will employ as soon as we start this case.

Id. at 93-94.

Cantwell argues the district court erred in denying his motion to excuse the entire voir dire panel for cause based upon the comments of Mooy, Jensen and Scott. We disagree.

"The trial court has broad discretion in conducting the voir dire examination." United States v. Gibbons, 607 F.2d 1320, 1330 (10th Cir. 1979); see also United States v. Garcia-Flores, 246 F.3d 451, 458 (5th Cir. 2001). "The ruling on a motion to dismiss or for a mistrial based on improper statements during voir dire is within the sound judicial discretion of the trial court . . . [and] will not be disturbed, absent a clear showing of abuse of that discretion." Gibbons, 607 F.2d at 1330; see also United States v. Wacker, 72 F.3d 1453, 1467 (10th Cir. 1995) ("When juror impartiality is questioned, the trial court has wide

discretion in evaluating the competency of a juror to sit, and its decision will not be interfered with except for a clear abuse of discretion.").

Cantwell argues that the comments made by the three prospective jurors tainted the remainder of the jury pool. "When improper or prejudicial remarks are made by one venireperson and heard by other venirepersons during the jury selection process, we have held that 'the test of juror impartiality is whether the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" United States v. Lacey, 86 F.3d 956, 969 (10th Cir. 1996) (quoting Wacker, 72 F.3d at 1467) (further quotation omitted). Further, "the partiality of the . . . jury is evaluated in light of those persons ultimately empaneled and sworn, not those who are excused." Id.

We find no error in the district court's denial of Cantwell's motion to dismiss the remainder of the jury pool. The three prospective jurors' remarks were brief and quickly terminated by the district court, and the court gave a clear curative instruction to the entire voir dire panel, reminding them that nothing they heard during the voir dire process could be considered by those who ultimately served as jurors. "Because the district court is in the best position to judge the effect of improper statements on a jury . . . its assessment is entitled to great weight." Wacker, 72 F.3d at 1467-68; see also Garcia-Flores, 246 F.3d at 458 ("The district judge was in the best position to evaluate the reaction of the jury

panel to the prospective juror's comments and the affect of his curative instruction."). The lack of taint is additionally demonstrated by the fact that the jury ultimately empaneled acquitted Cantwell on seven of the nine counts presented to it. See Gibbons , 607 F.2d at 1331 ("[W]e note that the jury's ability to render a fair verdict is indicated by its acquittal of the appellant on the conspiracy count."). The district court did not abuse its discretion in refusing to dismiss the entire voir dire panel.

## II. Expert Testimony

Cantwell made a motion in limine to exclude the testimony of the government's proposed expert, Alan Funk, on pyramid schemes because Cantwell had not been charged with operating a pyramid scheme and the admission of such testimony would violate Fed. R. Evid. 404 and 403. Appellant's App. II at 256. The government indicated that Funk would only testify as to the structure of pyramid schemes. The court permitted Funk to testify. Id. at 257-58. Cantwell made several objections at various times during Funk's testimony.

Funk testified that he was a certified fraud examiner based upon his "experience and education." Id. at 261. He further testified as to his experience in investigating pyramid schemes. Id. at 272-73. The court found him qualified

"to discuss [pyramid schemes and their ability to deceive] based on his experience and his training and his certification as a fraud examiner." Id. at 274-75.

Funk testified as to what a pyramid scheme is, opining that it "is a sales device that the focus of which is compensating individuals through the recruitment of others as opposed to a straight up economic transaction where there is a sale of goods or services that makes sense." Id. at 268. Funk also testified as to the economics of pyramid schemes and why they can be deceptive. When Funk was asked whether, in his opinion, Eagle Resources was a deceptive pyramid scheme, Cantwell objected on the basis of Fed. R. Evid. 702 and 704(b). Id. at 277. [4]

After the district court informed the government that it should limit its questions to "whether the information in [the Eagle Resources Program] has characteristics which in his experience and information are like a Ponzi scheme," id. at 279, thereby eliminating any 704(b) problem, Funk went on to explain how the Eagle Resources Program functioned economically. He stated that if all 6100 participants in the Program were to earn $417 in a month, 494,000 participants would be required, and if all 6100 were to earn $8,686 per month, a suggested

[4]Although Cantwell's attorney did not articulate the precise grounds of his objection, presumably the objection was that Funk was not qualified and/or that his testimony would not assist the jury in understanding the evidence under Rule 702, and that Funk's testimony would violate Rule 704(b)'s prohibition of an expert's expression of an opinion on an ultimate issue in the case.

possibility in one of the Eagle Resources brochures, 11,303,000 new participants would be required in that month.    Id. at 294-95.  Funk testified that, "[w]ith respect to Eagle Resources, each new transaction is a recruitment.  The sales make no economic sense whatsoever.  For those . . . who wish to earn the suggested earnings eventually there is a saturation effect that results in the pyramid being destroyed."    Id. at 298.

As indicated, Cantwell objected to Funk's testimony under Fed. R. Evid. 402, 403, 702 and 704(b).  We review a district court's decision to admit or exclude evidence, including expert testimony, for an abuse of discretion.        United States v. Velarde  , 214 F.3d 1204, 1208 (10th Cir. 2000).  Fed. R. Evid. 702, which governs the admission of expert testimony, provided at the time of Cantwell's trial as follows:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> an opinion or otherwise.

Fed. R. Evid. 702.  [5]  This rule "'imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable.'"        Velarde , 214 F.3d at 1208 (quoting    United States v. Charley   , 189 F.3d 1251, 1266 (10th Cir. 1999)). The trial judge has very broad discretion, however, "in both deciding

---

[5]Effective December 1, 2000, Rule 702 was amended.

how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." Id. at 1208-09. See generally Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Cantwell argues the district court failed to go through any specific steps to determine the reliability of Funk's testimony. We disagree. Funk testified to his education, training and experience.[6] He testified he had worked on approximately 300 different investigations, a fourth to a third of which were fraud related, including some twenty investigations specifically involving pyramid schemes. Appellant's App. II at 261, 265. He testified that he lectures at universities and for professional societies, and that he spends forty hours per year in continuing education. Id. at 261-62. While the court did not conduct a separate proceeding to determine Funk's qualifications, we are satisfied the record reveals that the district court adequately established Funk's qualifications to testify as an expert regarding pyramid schemes and their characteristics, and that it did not abuse its discretion in admitting his testimony.[7]

---

[6]Funk testified he received a B.S. degree in accounting, and was a certified public accountant and a certified fraud examiner. Appellant's App. II at 260-61.

[7]We have held that the court is afforded wide latitude in determining how to establish expert qualifications, and it need not conduct a separate proceeding.

(continued...)

- 15 -

Cantwell also argues the district court erred in determining that such testimony was relevant under Rule 402 and not prejudicial under Rule 403. Because he was not charged with operating a pyramid scheme, Cantwell asserts, testimony as to such schemes was irrelevant under Rule 402. Relevant evidence is defined as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. He thus argues that testimony about pyramid schemes was irrelevant to the wire and mail fraud counts for which he was on trial. He further alleges it was prejudicial under Rule 403.

As the government states in reply to this argument, Funk's testimony about pyramid schemes was relevant to the issue of whether Cantwell's Eagle Resources Program constituted a scheme to defraud, an element of the wire and mail fraud charges against him. Thus, it was highly relevant, and not unfairly prejudicial. We hold that the district court did not abuse its discretion in concluding that Funk's testimony was relevant, not unduly prejudicial, and therefore admissible.

---

[7](...continued)
See Charley, 189 F.3d at 1266 ("The trial judge is granted great latitude in deciding which factors to use in evaluating the reliability of expert testimony, and in deciding whether to hold a formal hearing.").

**III. Sufficiency of the Evidence**

Cantwell moved for judgment of acquittal following the government's presentation of its case, and the court ultimately denied the motion. Cantwell argues there is insufficient evidence supporting the jury verdict of guilty on the two counts involving Pessalano.

"The sufficiency of the evidence to support a criminal conviction is a question of law to be reviewed *de novo*. In doing so, however, we view the evidence and all reasonable inferences therefrom in the light most favorable to the jury verdict[]." United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002). We reverse a conviction only if we conclude that no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Williamson, 53 F.3d 1500, 1514 (10th Cir. 1995). "We do not weigh conflicting evidence or consider the credibility of witnesses." United States v. Janusz, 135 F.3d 1319, 1323 (10th Cir. 1998). Thus, the evidence is sufficient if, taken in the light most favorable to the government, the jury "could find guilt beyond a reasonable doubt, based on the direct and circumstantial evidence, together with the reasonable inferences therefrom." United States v. Smith, 133 F.3d 737, 741-42 (10th Cir. 1997).

Cantwell was convicted of mail and wire fraud. As charged in count five, mail fraud required proof of three elements: "'(1) the devising of a scheme or

artifice . . . to defraud . . ., (2) the specific intent to defraud, and (3) the use of the United States mails to execute the scheme.'" United States v. Haber, 251 F.3d 881, 887 (10th Cir. 2001) (quoting United States v. Kennedy, 64 F.3d 1465, 1475 (10th Cir. 1995)); 18 U.S.C. §1341. As charged in count six, "[t]o establish wire fraud under 18 U.S.C. § 1343, the government must prove (1) a scheme or artifice to defraud and (2) use of interstate wire communications to facilitate that scheme." Janusz, 135 F.3d at 1323; 18 U.S.C. § 1343. A scheme to defraud requires proof of "'conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension.'" Id. (quoting United States v. Hanson, 41 F.3d 580, 583 (10th Cir. 1994)). "Evidence of the 'schemer's indifference to the truth of statements can amount to [evidence of] fraudulent intent.'" United States v. Trammell, 133 F.3d 1343, 1352 (10th Cir. 1998) (quoting United States v. Reddeck, 22 F.3d 1504, 1507 (10th Cir. 1994)). We have explained that "the central focus of the first element is the existence of a scheme. It is not the making of the false pretenses, representations, or promises that constitutes the first element of the offense, . . . [i]t is the devising or intending to devise the scheme." Kennedy, 64 F.3d at 1475 (internal quotation omitted).

Cantwell argues that "the government failed to establish that he devised any scheme or artifice to defraud, or that he intended to deceive Pessalano in any of the conduct that he undertook as a part of the Eagle Resources business."

Appellant's Br. at 32. He argues, in essence, that Pessalano received all the materials he was told he would receive, that the value of the coins was revealed, that participants in the Program did not simply recruit others, but rather sold an actual product (the coins), and there was no evidence that Pessalano did not receive any commission or bonus to which he was entitled or which he had been told he would receive.

We hold that there was sufficient evidence from which a reasonable jury could find Cantwell guilty beyond a reasonable doubt of the two counts of mail and wire fraud and aiding and abetting in such fraud. [8] As the government argues, despite Cantwell's efforts to characterize his "linear pay program" otherwise, expert witness testimony established that it had critical elements of a pyramid scheme, in that participants' profits depended on recruiting new participants and the program faced a serious saturation problem. Although Cantwell asserts that there was "contradictory evidence presented on that point," id. at 33, it is within the jury's province to evaluate any conflicting evidence. Pyramid schemes constitute schemes to defraud under the mail and wire fraud statutes. See United States v. Gold Unlimited, Inc., 177 F.3d 472, 484 (6th Cir. 1999) ("Unquestionably, an illegal pyramid scheme constitutes a scheme to defraud.");

_____

[8]With respect to the mail fraud count, Cantwell does not dispute that the government established the element of use of the United States mails.

Webster v. Omnitrition Int'l, Inc., 79 F.3d 776, 786 n.7 (9th Cir. 1996) ("An inherently fraudulent pyramid scheme that meets the Koscot factors would fall within the[] broad definitions of fraud [contained in the mail and wire fraud statutes]."). [9] We agree with the government that it "established that Cantwell developed and managed the pyramid scheme and was responsible for the content of the marketing materials distributed to potential participants," including Pessalano. Appellee's Br. at 40.

With respect to count six, the wire fraud count, Cantwell argues "there was insufficient evidence of any wire communication made for the purpose to defraud." Appellant's Br. at 35. He asserts that the only evidence of a wire communication involving Pessalano is the telephone call to Felicia to request a

---

[9]In In re Koscot Interplanetary, Inc., 86 F.T.C. 1106 (1975), aff'd mem. sub nom., Turner v. F.T.C., 580 F.2d 701 (D.C. Cir. 1978) the Federal Trade Commission established a definition for pyramid schemes as devices which:
> are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users. . . . .
>
> As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed.

Id. at 1181.

refund. As the government responds, to support the wire fraud conviction, it had to prove the existence of a scheme to defraud and the use of interstate wire communications to facilitate that scheme. The government established that Cantwell set up a toll-free number to recruit and maintain participants. Moreover, specifically with respect to Pessalano, he testified that he called that toll-free number to ask for a refund, and was told he would receive one promptly once he returned all his materials. The government did not need to prove that any specific false representation was made to Pessalano in that call, only that the telephone call furthered the scheme to defraud. See Kennedy, 64 F.3d at 1476 ("[S]chemes to defraud need not even contemplate the use of affirmative misrepresentations."). It was entirely reasonable for the jury to conclude that that telephone call did just that. [10]

In sum, there was sufficient evidence from which the jury could find, beyond a reasonable doubt, the elements of mail fraud and wire fraud and aiding and abetting such fraud.

---

[10]As the government argues, the assurance of a refund, like a "lulling letter" in a mail fraud scheme, could be considered to further the scheme to defraud. See Trammell, 133 F.3d at 1352-53 (noting that "[t]he Supreme Court has defined a 'lulling letter' as a mailing that is 'designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant [] less likely'") (quoting United States v. Maze, 414 U.S. 395, 403 (1974)).

## IV. __Allen__ Charge

Finally, Cantwell argues the district court erred in giving an __Allen__ charge to the jury after it informed the court it could not reach a unanimous verdict. At the conclusion of the trial, the jury deliberated until 9:45 p.m., when it sent a note to the court indicating it could not reach a unanimous verdict. The court proposed an __Allen__ charge, to which Cantwell objected.[11] The court overruled the objection and instructed the jury as follows:

> In a large proportion of the cases and perhaps strictly speaking in all cases absolute certainty cannot be obtained nor can it be expected. Although the verdict to which a juror agrees must of course be his own verdict or her own verdict, the result of his or her own convictions, and not a mere acquiescence in the conclusions of his or her fellow jurors. Yet in order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor and with the proper regard and deference to the opinion of each other.

> You should consider that you're selected in the same manner and from the same source from which any future jury must be selected. There is no reason to suppose that this case will ever be submitted to 12 men and women who are more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will be produced on one side or the other. And with this view it is your duty to decide the case if you can consciously do so without violence to your individual judgment.

---

[11]Cantwell's attorney objected on the ground that the __Allen__ charge might "tend to lead jurors to disregard their duty." Appellant's App. II at 515. He did not object, however, to the language of the particular __Allen__ charge the court proposed to give and did, in fact, give.

In the event that you cannot so decide a jury has a right to fail to agree. In order to make a decision more practical the law imposes a burden of proof on one party or the other in all cases. The high burden of proof which must be sustained by the prosecution has not changed. In the present case the burden of proof is on the government to establish with respect to each count each essential element of the offense and to establish that essential element beyond a reasonable doubt. And if with respect to any element of any count you are left in reasonable doubt the defendant is entitled to the benefit of such doubt and must be acquitted.

But in conferring together you ought to pay proper respect to each other's opinions, and you ought to listen with the disposition to being convinced to each other's arguments. Thus where there is a disagreement jurors favoring acquittal should consider whether a doubt in their own mind is a reasonable one, when it makes no impression on the minds of the other equally honest and equally intelligent who have heard the same evidence, and with the same degree of attention and with an equal desire to arrive at the truth and under the sanction of the same oath.

On the other hand, jurors for conviction ought seriously to ask themselves whether they should doubt the correctness of a judgment which is not concurred in by others with whom they are associated and distrust the weight of sufficiency of that evidence which fails to carry conviction in the minds of their fellow jurors.

Finally, not only should jurors in the minority reexamine their positions, but jurors in the majority should also do so to see whether they have given careful consideration and sufficient weight to the evidence which has favorably impressed the person in disagreement with them. That, of course, assumes there is a majority. For all I know you are split six and six. If you are, please consider those comments.

Incidentally, if you are unable to reach a unanimous verdict as to all counts you are free to return a verdict on those counts, if any, to which all of you do agree. I am instructing you now to go back and resume your deliberations. And by asking you that I don't mean to force you at all to work longer than you want. I am just asking

you now to go back and give it another try. If you're too tired to go on you can come back in the morning, or you can after trying tell me that you cannot reach a unanimous verdict and that is okay. Or after maybe pausing and considering some of the statements made in this final instruction it may cause you to come to a unanimous verdict.

I don't mean to press you to work longer than you want to tonight. I would encourage you not to work much longer than another hour at the most. It is 10:00 now. I would give it another good try if you will, please. You have been here all day and you have worked a hard, long day and it has not been easy I am sure. It is not an easy task especially when there is not easy agreement. I do want you to know how much we appreciate it. If the case ends in what we call a hung jury with you're not agreeing I will declare a mistrial and it is up to the prosecution whether the case is prosecuted again. It may be and, therefore, the comments in this instruction about another jury being selected just the same way you were from the same jury panel in the District of Utah, and if it were tried again it would be presented to a different group of 12.

So that is why I think it is in our best interest and in the criminal justice system's best interest to ask you to give it another good conscientious effort. Okay. All right. I am not suggesting an hour is magical. If it goes a little beyond that and you think you can reach a verdict, and I take it, Mr. Dean, you are the foreperson?

MR. DEAN: Yes.

THE COURT: You monitor this and if there comes a point where you have a verdict let us know and if you want to go home let us know, or if you are just hopelessly deadlocked let us know.

Appellant's App. II at 517-20.

At 11:30 p.m., the jury sent the court another note indicating the jury would like to leave for the evening and resume deliberations in the morning. The jury asked permission to resume deliberations at 9:00 a.m. the following morning. The

court informed them that, because of a funeral, he would be unavailable to accept a verdict until 2:00 p.m. [12] The jury resumed deliberation the following morning and returned a guilty verdict on counts five and six. [13]

Cantwell argues the language used in the Allen charge had a "coercive effect in urging the jury to reach a decision, informing them that if they did not, a mistrial would be declared." Appellant's Br. at 38. He also argues the judge's statement that he could not take a verdict until 2:00 p.m. coerced the jury by impermissibly imposing a particular time frame for reaching a verdict. Cantwell also asserts that the charge was coercive because it was given only after the jury informed the court that it could not reach a unanimous verdict, rather than in conjunction with all the other jury instructions.

We have recently thoroughly explored Allen charges and the considerations which may lead to the conclusion that a particular Allen charge is or is not unduly coercive. "With respect to the coerciveness of the charge actually given, this circuit has adopted a case-by-case approach, . . . considering such factors as '(1) [t]he language of the instruction[;] (2) its incorporation with other instructions; and (3) the timing of the instruction.'" United States v. McElhiney, 275 F.3d 928,

---

[12]In fact, because the funeral was for the wife of a fellow district court judge, no judge would have been available to accept a verdict until 2:00 p.m.

[13]There is no evidence in the record as to exactly when the jury returned its verdict.

940 (10th Cir. 2001) (quoting United States v. Porter, 881 F.2d 878, 888 (10th Cir. 1989)) (further citations omitted). The "ultimate question" always is "whether the Allen instruction was 'impermissibly coercive in a way that undermined the integrity of the deliberation process.'" Id. (quoting Porter, 881 F.2d at 889) (footnote omitted).

Cantwell first challenges the timing of the Allen instruction given in this case, arguing that it should have been given along with all the other jury instructions, and that it was unduly coercive because it was given only after the jury announced it could not reach a unanimous verdict. While we have noted that it is preferable to give an Allen instruction along with all other jury instructions, we have specifically approved such instructions given after the jury has reached an impasse. See McElhiney, 275 F.3d at 942 ("We hasten to note that this positioning of the instruction [after the jury has reached an impasse] does not by itself establish coercion."); United States v. Arney, 248 F.3d 984, 988-89 (10th Cir. 2001) ("Although this court has stated that the preferred practice is to issue an Allen charge prior to jury deliberations along with other jury instructions, we have found on numerous occasions that Allen charges given to a jury during its deliberations were not unduly coercive.") (internal citation omitted). Thus, we have no *per se* rule that an Allen charge given after the jury has announced it is

deadlocked is necessarily coercive. Rather, we examine the language of the instruction and other factors to assess coerciveness.

The charge given in this case was what we have described as a "'modified' Allen charge, differing from a traditional Allen charge by asking each juror, rather than only those in the minority, to carefully reconsider the evidence." Arney, 248 F.3d at 988. Such charges reduce the possibility of coercion. Id. Considering our prior case law, the Allen charge given in this case was not coercive. It contained the cautionary language that "no juror should surrender his or her conscientiously held convictions and that the burden of proof belonged to the government, not the defendant." McElhiney, 275 F.3d at 943. Moreover, the instruction did not unduly emphasize either the desirability of a verdict and/or the court's desire for a verdict, nor did it emphasize the expense and/or difficulty of a retrial should the jury remain deadlocked. Cf. id. 275 F.3d at 944 (noting that instruction was problematic because of two embellishments–emphasizing desirability of reaching verdict and statement about expense and danger involved in retrial).

Finally, Cantwell suggests that the court implicitly placed a deadline on the jury's deliberations by informing the jury that he could not accept a verdict until 2:00 p.m. of the day following the giving of the Allen instruction. We disagree. The judge simply informed the jury of the fact that any verdict could not formally

be accepted until at least 2:00 p.m.  Nothing in his instruction or dialogue with the jury in any way suggested that there was any particular deadline.  In fact, he stated that it was completely acceptable for the jury to *not* reach a verdict.

In sum, we conclude that the very thorough and lengthy <u>Allen</u> charge given in this case was not unduly coercive.  Indeed, it was a virtual model in thoroughness and balance, omitting none of the language which we have emphasized should be included in a proper <u>Allen</u> charge, while avoiding language we have found troublesome.

## CONCLUSION

For the foregoing reasons, we AFFIRM Cantwell's conviction and sentence.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge