FILED
United States Court of Appeals
Tenth Circuit

April 5, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADRIAN PATTERSON,

Defendant-Appellant.

No. 11-3258

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 09-CR-10099-JTM)**

---

*Submitted on the briefs*

William H. Campbell, Oklahoma City, Oklahoma, on opening brief, and Kenneth Scott Williamson, Goodlettsville, Tennessee, on supplemental opening brief and reply for Appellant.

Debra L. Barnett, Assistant United States Attorney, with Barry R. Grissom, United States Attorney, Wichita, Kansas, on brief for Appellee.

---

Before **TYMKOVICH**, **EBEL**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Adrian Patterson was convicted by jury trial of a number of drug charges,

including conspiracy to possess with intent to distribute five kilograms or more of

cocaine. On appeal, Patterson raises a number of challenges to his conviction and sentence. As we explain below, none of the pretrial, trial, and sentencing claims have merit. We hold, among other things, that the district court did not err in denying a competency hearing; declining to exclude evidence at trial on Fourth Amendment and hearsay grounds; conducting and instructing the jury; and sentencing Patterson.

Exercising jurisdiction under 28 U.S.C. § 1291, we accordingly AFFIRM.

## I. Background

The events that gave rise to Patterson's indictment stem from a Drug Enforcement Administration (DEA) investigation into whether Bernard Redd was distributing cocaine in Wichita, Kansas. The DEA agents began to suspect Redd was involved in a cocaine distribution conspiracy after they linked him to Richard Smart, whom the agents believed to be a large-scale cocaine distributor in Dallas, Texas, and who was already the subject of DEA surveillance. The agents had placed wiretaps on phones used by Smart and overheard a series of calls made between Smart and Redd that the agents interpreted to involve illegal drug dealing. Based in part on these communications, the agents obtained a wiretap on Redd's phone.

The agents also connected Redd to Fredrick Bradley, whose home was searched by police after neighbors reported that it had been the site of a shooting. This search revealed that the home was filled with cocaine and implements to

manufacture and distribute cocaine. Bradley was subsequently arrested in Louisiana after attempting to evade the authorities. Prior to his arrest, Bradley had a series of conversations with Redd. And after Bradley's arrest, DEA agents recorded wiretapped phone conversations in which Redd discussed whether Bradley would cooperate with police.

The DEA wiretap on Redd's phone also revealed that Redd was in communication with his cousin, Adrian Patterson. Based on their interpretation of the calls between Patterson and Redd, the DEA agents concluded that the cousins were discussing the possibility of selling cocaine.

The government ultimately indicted Patterson and a number of other individuals for their roles in a cocaine distribution operation that extended throughout Kansas, Oklahoma, and Texas.[1] As is relevant to this appeal, the government alleged Smart was a large-scale cocaine distributor who agreed to sell his product to Redd, who in turn agreed to sell it to Patterson. The government further alleged that Redd had previously sold cocaine to Bradley. Redd essentially functioned as a middleman connecting Smart to Patterson.

Redd and Patterson were initially tried together on the drug conspiracy charges. During the trial, however, Redd pleaded guilty, leaving Patterson as the

---

[1] Although Patterson was charged with a number of other crimes, including conspiracy to distribute marijuana, his involvement in the cocaine distribution conspiracy is the principal matter relevant to this appeal. Aside from a challenge to the sufficiency of the indictment issued against him, Patterson raises no challenges to his other convictions.

sole defendant. Meanwhile, Smart and Bradley became cooperating witnesses and testified against Patterson and Redd at trial.

A substantial portion of the evidence presented against the co-conspirators was obtained through wiretaps of their telephone conversations.[2] In these recorded conversations, the government argued that the co-conspirators spoke in coded language to arrange drug deals. For example, in analyzing one conversation between Redd and Patterson, the government suggested that when Patterson told Redd he was "light" or "like sevens" or "close to eight," and then stated "they won't unloosen the screws, huh," R., Vol. II, at 672, these were references to the fact that Patterson did not have enough money to purchase cocaine and wanted to purchase some quantity on credit. Similarly, the government argued that the co-conspirators, including Patterson, used specific code words for certain matters related to the conspiracy: for example, the government suggested that "Tanisha" was a code word for Smart or Smart's drug dealing, while a reference to the size in inches of certain tires at a used car lot run by Smart was in fact a reference to the price in thousands of dollars of a kilo of cocaine.

The government presented much of the wiretap evidence through the testimony of DEA Special Agent Erik Smith, who provided his interpretation of a

---

[2] Additional recordings were facilitated by Smart, who wore a body wire during conversations he had with Redd.

number of these conversations, based on his experience as a DEA agent and his surveillance of the members of the conspiracy. Agent Smith also provided context to the wiretapped conversations by showing how certain discussions between Redd and Patterson were linked to ones that Redd had with Smart. For example, Agent Smith interpreted a series of conversations between Patterson and Redd and then Redd and Smart, in which Agent Smith alleged that Patterson implored Redd to allow him to buy cocaine on credit, Redd tried to make this purchase with Smart on behalf of Patterson, and Smart did not accept the offer.

Finally, Smart and Bradley, as cooperating witnesses for the government, provided context to the coded conversations they had with Redd and confirmed that they were in fact using coded language to discuss drug dealing. For example, Bradley testified that he and Redd "really didn't use numbers on the phone, so we talk[ed] about it in person" and then would confirm the order over the phone with phrases such as "had he seen those hos, or were those hos in town, and [Redd] would say yay or nay [to confirm the order]." R., Vol. II, at 483–84. Similarly, Smart confirmed that when Redd asked to speak to "Tanisha," it was a code that meant he wanted to buy drugs or negotiate a drug deal at Smart's mom's house, [*id.* at 768–69], and when Smart told Redd about the size of tires for sale at his car lot, he was in fact suggesting the price for a kilo of cocaine.

Although both of the cooperating witnesses admitted they had never directly agreed to sell drugs to Patterson and had not had recent direct contact

with Patterson, they did provide other evidence linking Patterson to the cocaine conspiracy. For example, Bradley identified Patterson in court and noted Redd had complained that Patterson was "short with money." *Id*. at 494. From the context of this conversation, Bradley thought Redd was saying Patterson was not good at managing money related to his drug sales. Likewise, Smart provided no evidence of direct dealings with Patterson (and could not identify him in court) but referenced conversations he had with Redd in which Redd said that "his cousin," a rapper, would buy cocaine supplied by Redd and was having troubles with money. *Id*. at 831. Patterson was in fact an aspiring rapper, and, as noted above, Redd and Patterson are cousins.

Finally, the government elicited testimony from a jailhouse informant. The informant and Patterson had been in custody together while both men were awaiting their trials on federal drug charges. The informant testified that Patterson made a number of incriminating statements to him while they were in jail together. As relevant to this appeal, the informant testified that Patterson had told him that he received cocaine from a cousin, who provided him with two to four kilos of cocaine. The informant also provided a letter to prosecutors in which he appears to have explained in greater detail what he had learned about the cocaine conspiracy. The letter itself does not appear to be part of the record on appeal but was introduced at trial.

Patterson was convicted after a five-day jury trial and sentenced to 160 months' imprisonment for the cocaine conspiracy charge. Patterson then timely filed this appeal challenging his conviction and sentence. We provide further factual and procedural background below as it becomes relevant to resolving each of Patterson's claims.

## II. Analysis

Patterson challenges a wide range of the pretrial, trial, and sentencing decisions of the district court. He contends:

(1) the district court erred in denying his request for a pretrial hearing to determine his competency to stand trial;

(2) the evidence offered by the government was insufficient both to support his conviction and to provide a basis for the admission of testimony under the co-conspirator exception to the hearsay rule;

(3) his Sixth Amendment rights under the Confrontation Clause were violated when hearsay testimony linking him to the conspiracy was introduced at trial;

(4) the district court improperly instructed the jury;

(5) the district court's finding at sentencing that he was responsible for the distribution of fifteen kilos of cocaine is clearly erroneous;

(6) the indictment was insufficiently specific as to the counts charged against him; and

(7) the district court erred in failing to exclude evidence obtained in violation of his Fourth Amendment rights.

We address in turn the reasons we affirm the district court.

### A. *Pretrial Competency Hearing*

Patterson's first challenge is to the district court's decision to deny him a hearing to determine whether he was competent to stand trial. We review the district court's decision for abuse of discretion. *United States v. Martinez-Haro*, 645 F.3d 1228, 1232 (10th Cir. 2011). We will not reverse the district court if its decision falls within the bounds of permissible choice under the circumstances and is not arbitrary, capricious, or whimsical. *United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011).

A defendant's right to a competency hearing is governed in part by 18 U.S.C. § 4241(a), which requires a district court to grant a motion for a hearing in limited circumstances. These include "if there is *reasonable cause* to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *Id*. (emphasis added).[3]

---

[3] The Due Process Clause of the Fifth Amendment also requires an adequate hearing under essentially the same standard as the one described in § 4241. *See Drope v. Missouri*, 420 U.S. 162 (1975); *Pate v. Robinson*, 383 U.S. 375 (1966); *United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1233–34 (10th

(continued...)

-8-

"The issue of whether there is reasonable cause under 18 U.S.C. § 4241(a) rests in the discretion of the [district] court.  As such, a district court may consider many factors when determining whether reasonable cause to order a competency hearing exists, including (but not limited to) its observations of the defendant's demeanor during the proceeding." *United States v. Arenburg*, 605 F.3d 164, 169 (2d Cir. 2010) (citations and internal quotations omitted); *see also United States v. Landers*, 564 F.3d 1217, 1221 (10th Cir. 2009) (denying a claim that the district court erred in failing to order a competency hearing based in part on the court's observation of the defendant and a review of his writings); *United States v. Pompey*, 264 F.3d 1176, 1179 (10th Cir. 2001) (noting that in determining a defendant's competency to stand trial, after a competency evaluation has been performed, the district court "may rely on a number of factors, including . . . the court's observations of the defendant's comportment").

In reviewing a district court's decision as to mental competency, we "stress that the observations and conclusions of the district court observing [the defendant's] behavior and demeanor [in determining reasonable cause to grant a competency hearing] are crucial to any proper evaluation of a cold appellate record." *United States v. Cornejo-Sandoval*, 564 F.3d 1225, 1234 (10th Cir. 2009); *see also United States v. Rickert*, 685 F.3d 760, 767 (8th Cir. 2012)

---

[3](...continued)
Cir. 2009) (noting that the standard announced in *Pate* and § 4241 are essentially the same).

(noting "the district court's institutional advantage over the court of appeals in evaluating the demeanor of the defendant and the statements of counsel about the defendant's mental state"), *cert denied*, No. 12-8613, 2013 WL 506825 (U.S. Mar. 18, 2013).

And we note "[t]he requirement of § 4241(a) that the district court grant a competency hearing when reasonable cause exists cannot be expanded to require such a hearing any time that a defendant engages in disruptive tactics or pursues a frivolous legal strategy." *United States v. Banks*, 482 F.3d 733, 743 (4th Cir. 2007); *see also Cornejo-Sandoval*, 564 F.3d 1225 (affirming the denial of a motion for a competency hearing where defendant was only found to be a difficult client who engaged in disruptive behavior); *Landers*, 564 F.3d at 1222 (affirming a district court's denial of a competency hearing in part because the defendant, though he engaged in disruptive behavior during the trial, did not do so because of any mental incompetency).

In Patterson's pretrial motion for a competency hearing, his attorney asserted that Patterson had trouble paying attention for long periods of time and had previously been diagnosed as suffering from Attention Deficit Disorder (ADD). Based on these observations, Patterson's attorney raised concerns in the motion about his client's ability to concentrate or control himself during pretrial preparations or during the trial itself.

The district court denied Patterson's motion, concluding the allegations did not suffice to establish reasonable cause for a competency hearing. Among other reasons, the court based its decision on its prior observations of Patterson in court, where he "appeared alert, responsive, knowledgeable[,] and understanding of what was happening." R., Vol I, at 194. The court further determined that Patterson's ADD had apparently been successfully treated and, notwithstanding this condition, Patterson had proved himself to be a competent businessman and manager of property before his arrest. Finally, the court noted that Patterson had filed his own *pro se* motion to limit the evidence that could be used against him at trial. While the court noted that the motion was lacking in legal merit, the court reasoned that the motion "demonstrates a valid general understanding of the charges and the issues involved in the case." *Id*.

On appeal, Patterson contends the district court erred in three ways in denying his motion. First, he argues the district court unjustifiably discounted the fact that the *pro se* motion he filed was so incoherent as to raise questions about Patterson's mental competency. Second, he suggests that a court "should not be the final arbiter as to the competence of any defendant" and implies that when any doubt exists as to whether a defendant is incompetent, a court should defer to a mental health expert to obtain a definitive evaluation. Aplt. Br. at 12;[4] *see also*

---

[4] Patterson submitted two opening briefs in this case, which he referred to as his opening brief and his supplemental opening brief. We only have occasion

(continued...)

Rep. Br. at 7 ("[It] is the very purpose of §[ ]4241(a) to allow a trained person to determine a defendant's mental competency.").  Finally, his appellate counsel, who did not represent Patterson at the district court, suggests that Patterson may have been suffering from Asperger's Syndrome or Obsessive Compulsive Disorder during the trial and that on this basis alone he would have been entitled to an evaluation under § 4241.

None of these arguments convince us that Patterson has satisfied the high standard required for finding that the district court abused its discretion.  As to Patterson's first contention, we have reviewed the content of Patterson's *pro se* motion and agree with the district court that the structure and legal reasoning of the document would fall below the level we would expect from competent counsel.  But we disagree with Patterson that this document is reliable evidence of his incompetence to stand trial or that it would even entitle him to a competency hearing.  To the contrary, the motion shows that Patterson both understands the nature of the evidence to be presented against him and the consequences of certain litigation strategies that were in fact employed by his attorney.[5]

---

[4](...continued)
to cite the first brief he submitted, which we refer to as "Aplt. Br."

[5]  For example, Patterson argues in the motion that certain forms of hearsay evidence to be presented against him might be inadmissible and that incriminatory evidence obtained in violation of his Fourth Amendment rights might be similarly
(continued...)

We also reject Patterson's apparent contention that the district court cannot provide a gate keeping determination of whether to grant a competency hearing. Allowing defendants to obtain a competency hearing absent reasonable cause would invite defendants to initiate disruptions to delay their cases and make it more difficult to identify legitimate allegations of incompetency.

Finally, we note that even if Patterson had Asperger's Syndrome or Obsessive Compulsive Disorder, this alone might not be sufficient to warrant a competency hearing. To the contrary, as § 4241(a) dictates, Patterson would still need to show reasonable cause that his disorder made "him mentally incompetent *to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense*" (emphasis added); *see also United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986) ("It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial."), *cert. denied*, 479 U.S. 1036 (1987).

In sum, there was nothing arbitrary about the district court's denial of Patterson's motion. Rather, it was based on the district court's direct observations of the defendant and a reasoned review of the evidence known about the defendant at the time the motion was made.

---

[5](...continued)
excluded. These are the same types of claims raised by Patterson on appeal, though they are presented by his lawyer in a more coherent form. Thus, rather than supporting Patterson's argument that he was entitled to a pretrial competency hearing, the *pro se* motion in fact undermines it.

### B. *Sufficiency of the Evidence*

Patterson next raises two challenges to the sufficiency of the evidence used by the government at various stages of its case against him. First, he challenges the district court's finding at a pretrial *James* hearing that the government had established, by a preponderance of the evidence, the existence of a conspiracy to distribute cocaine, such that statements made between the co-conspirators in furtherance of the conspiracy could be admitted under this exception to the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(E). Patterson alleges this finding was clearly erroneous. Second, Patterson challenges the sufficiency of the evidence used to convict him of the cocaine conspiracy charge.

Our evaluation of these two claims implicates different standards of review. First, as to the challenge related to the *James* hearing, in order to admit statements under the co-conspirator exception to the hearsay rule, the district court had to determine: "(1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994) (citation omitted). We review the district court's findings of fact with respect to these three matters for clear error. *United States v. Caro*, 965 F.2d 1548, 1557 (10th Cir. 1992).

Second, as to the evidence used to convict Patterson of the cocaine conspiracy charge, the government was required to show: (1) Patterson and at least one other person agreed to distribute cocaine, (2) Patterson knew the essential objectives of the conspiracy, (3) Patterson knowingly and voluntarily became a part of the conspiracy, and (4) there was interdependence among the members of the conspiracy. *See, e.g.*, *United States v. Hernandez*, 509 F.3d 1290, 1295 (10th Cir. 2007). Because Patterson was convicted on this charge, we review the evidence presented at trial in the light most favorable to the government to determine if a reasonable juror could find beyond a reasonable doubt from the evidence, along with reasonable inferences therefrom, that Patterson was guilty. *See, e.g.*, *United States v. Earls*, 42 F.3d 1321, 1324 (10th Cir. 1994).

The evidence presented at the *James* hearing comprised testimony from Special Agent Smith, who discussed both his interpretation of a number of wiretapped phone calls between various co-conspirators and his surveillance of the co-conspirators' movements during the course of the conspiracy. From this evidence, the district court made the following factual finding:

> By a preponderance of the evidence, the intercepted calls demonstrate the existence of an agreement among Redd, Patterson and others to obtain and distribute narcotics. Redd, Patterson and other persons worked together to obtain drugs, obtain payment or financing for the sale of drugs, discussed how to use cell phones and coded language to avoid police investigations, how the drugs should be priced, and identif[ied] unreliable customers. Contrary to the

-15-

suggestions of Patterson, the telephone calls are neither the innocuous conversations of casual acquaintances, nor unnecessarily redundant or repetitive, since the collective nature of the evidence is necessary to demonstrate the nature, context, and duration of the conspiratorial agreement.

R., Vol. I, at 265. Our review of the record, especially the detailed evidence regarding coded exchanges submitted by the government at the *James* hearing, convinces us that this factual finding as to the existence of a conspiracy was not clearly erroneous. Patterson's attacks on this finding mainly involve conclusory allegations about how the above finding was a foregone conclusion and how Agent Smith's testimony was unsubstantiated. He also renews the suggestions he made in the district court that the only possible interpretation of the wiretapped conversations is that they were unrelated to drug dealing. None of these contentions persuade us that the district court reached the incorrect result, especially on review for clear error.

Patterson also suggests the government failed to disprove that the conspiracy only involved a mere buyer-seller relationship between Redd and Patterson. As Patterson notes, in *United States v. McIntyre*, 836 F.2d 467 (10th Cir. 1987), we reversed a conviction for a drug distribution conspiracy where the government failed to show that a defendant was not merely at the end of a drug distribution chain and had no intention to distribute the cocaine for profit.

Yet *McIntyre* is distinguishable from the facts of this case: in contrast to the defendant in *McIntyre*, there is substantial evidence that Patterson was

-16-

involved in and knew about the wider drug conspiracy scheme and intended to further distribute the drugs. For example, Patterson contacted Redd and attempted to arrange to purchase large quantities of cocaine, on credit, to finance continued drug-dealing operations. Moreover, unlike in *McIntyre*, Patterson was also convicted for his involvement in a related marijuana distribution scheme, a conviction he does not challenge on appeal. In any case, it was not clearly erroneous for the district court to conclude that Patterson was more than a buyer of cocaine. *See also United States v. Cornelius*, 696 F.3d 1307, 1330 n.5 (10th Cir. 2012) (distinguishing *McIntyre* on similar grounds).

Likewise, Patterson's attack on the sufficiency of the evidence used to convict him of the cocaine conspiracy charge also fails. As noted above, the evidence presented at trial against Patterson comprised much of the same evidence used at the *James* hearing, including many of the same wiretapped conversations and similar testimony from Special Agent Smith. In addition, the government offered the testimony of two cooperating witnesses and a jailhouse informant who all provided testimony implicating Patterson in the cocaine distribution operation.

Patterson resists this conclusion mainly by attempting to reassert the same arguments that failed to convince the jury: he attacks the credibility of Agent Smith and the cooperating witnesses, he selectively cites the record in an attempt to point to purported weaknesses in the government's case, he alleges myriad

injustices visited upon him by the DEA and prosecutors, and he suggests that all of these abuses undermined his due process rights. None of these largely conclusory allegations convince us to disturb the jury's verdict.

Viewed in the light most favorable to the government, a rational juror could draw the conclusion from this evidence that Patterson was involved in a conspiracy to distribute cocaine.[6]

## C. Confrontation Clause

Patterson next raises a challenge under the Confrontation Clause to two statements from Smart and Bradley admitted at trial. As noted above, these witnesses testified that Redd told them Patterson was involved in the drug conspiracy. Patterson argues that the admission of such testimony violates principles established by the Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004), and *Bruton v. United States*, 391 U.S. 123 (1968). In *Crawford*, the Supreme Court held that the Sixth Amendment precluded the admission of out-of-court statements that are testimonial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. In *Bruton*, the Court held that it would violate the Confrontation Clause to allow the

---

[6] Patterson also alleges that Agent Smith's testimony was so unreliable it constitutes structural error meriting invalidation of his conviction. The Supreme Court has only identified a few errors, such as the total deprivation of the right to counsel or a trial by a biased judge, that constitute structural errors. *See, e.g.*, *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). We find no error in the type of testimony Agent Smith offered at trial, let alone structural error.

confession of a non-testifying co-defendant that implicated the defendant to be used against that defendant.

The admission of these two statements violated neither *Crawford* nor *Bruton* because both statements were made in furtherance of a conspiracy and were therefore nontestimonial. First, as we explained above, there was sufficient evidence presented at the *James* hearing to establish the basis for the admission of co-conspirator statements under this exception to the hearsay rule. Second, the statements at issue here, which related to concerns about how to finance the conspiracy and identify the members of the conspiracy, were made "in furtherance of the conspiracy" for purposes of this hearsay exception. *See United States v. Roberts*, 14 F.3d 502, 515 (10th Cir. 1993) ("Statements made . . . to keep co-conspirators abreast of an ongoing conspiracy's activities satisfy the 'in furtherance' . . . requirement [under Rule 801(d)(2)(E)].") (quoting *United States v. Yarbrough*, 852 F.2d 1522, 1535–36 (9th Cir.), *cert. denied*, 488 U.S. 866 (1988)).

Third, because these statements were made in furtherance of a conspiracy, they are nontestimonial and present no Sixth Amendment problem. *See Crawford*, 541 U.S. at 56 (noting that a statement in furtherance of a conspiracy is *not* testimonial); *United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir.

-19-

2010) (noting that the *Bruton* rule does not apply to nontestimonial hearsay).  The claim therefore fails.[7]

### D.  *Improper Statements by the Trial Judge*

Patterson next suggests that comments made by the district court at the close of trial improperly influenced the jury.  Specifically, Patterson alleges that comments made by the district court judge in which the judge noted that he would be out of town the week after the trial concluded, and that a different judge would have to handle the jury verdict, if a verdict was not reached before the end of the week, combined to exert undue coercion on the jury.  No objection to the court's comments was lodged below, so we review for plain error.  *See United States v. Lewis*, 594 F.3d 1270, 1288 (10th Cir. 2010).

---

[7]  Patterson also suggests that testimony from Agent Smith about telephone records obtained from Patterson's cell phone carrier, Sprint, was admitted at trial in violation of his Sixth Amendment rights.  In advancing this position, Patterson relies upon *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), in which the Supreme Court held that "affidavits" issued regarding the results of drug analyses "are 'testimonial,' rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment."  *Id*. at 307.  Patterson, however, does not point to anywhere in the record where this testimony was introduced and even incorrectly represents that the phone records were entirely admitted through Agent Smith (when, in fact, a Sprint technician was called by the government on the first day of the trial to testify about how the company compiled the cell phone information requested by the government).  But even with an adequate record, this claim fails. We have previously held that admitting cell phone records of the type at issue here does not raise a Sixth Amendment problem.  *See United States v. Yeley-Davis*, 632 F.3d 673, 678 (10th Cir.), *cert. denied*, 131 S. Ct. 2172 (2011).

Patterson points to two statements made by the trial judge in support of his argument. The first is a statement from the third day of the trial, in which the court noted that because of scheduling needs, the trial would start earlier and end later on certain days. In passing, the district court also noted that the court and the jury "have to" adopt this modified schedule due to other responsibilities of the court. R., Vol. II, at 610. The district court concluded by stating, "I appreciate any help that you can give us in accommodating our schedule here and your patience." *Id*. at 611.

The trial concluded two days later on a Friday at around 5 p.m. At this time, the district court told the jury: "I am going to leave it to you whether you wish to commence [y]our deliberations today or whether you would prefer to come back on Monday and begin at 9 o'clock in the morning." *Id*. at 1245. The plain meaning of the court's statements is that the jury had the choice to continue deliberating into the evening on Friday or return on Monday morning to commence deliberations. Further, all parties were on notice that a different judge would handle the verdict in the event that deliberations extended to Monday. The jury chose to begin deliberations on Friday and returned a verdict at 7:30 p.m.

Patterson's interpretation of the court's comments as coercive is unpersuasive. He characterizes the district court's remarks as the equivalent of an

-21-

impermissible *Allen* charge:[8] a command that "imposes such pressure on the jury such that the accuracy and integrity of their verdict becomes uncertain, thereby violating a defendant's rights to due process, Sixth Amendment rights to an impartial jury trial and to a unanimous verdict." *United States v. Zabriskie*, 415 F.3d 1139, 1148 (10th Cir. 2005).

Patterson's contention has no basis in the record or in the law. The one case he cites where we reversed a verdict because of an impermissible *Allen* charge, *United States v. McElhiney*, 275 F.3d 928 (10th Cir. 2001), is easily distinguishable. In that case, the district court judge explained, in the presence of the jury, that he had received "a note from the jury here that is very distressing to me because this has been one of the greatest major efforts made in time and attention and money that I have noted in my 24 years as being a judge." *Id.* at 934. He asked the jury, specifically the jury's foreperson, to continue deliberating by stating, in part: "I'd be very happy to have a verdict one way or the other. . . . [T]he time and attention and the danger of this case has been, you

_____

[8] The term "*Allen* charge" derives from *Allen v. United States*, 164 U.S. 492 (1896), in which the Supreme Court upheld the legality of a supplemental instruction to a jury unable to reach a consensus. "The instruction at issue in *Allen* directed those jurors holding minority views to reconsider their views in light of the contrary views held by the majority of jurors, but stated that the verdict must be that of each individual juror." *Darks v. Mullin*, 327 F.3d 1001, 1013 (10th Cir. 2003) (citing *Allen*, 164 U.S. at 501). We have frequently upheld the use of supplemental instructions that conform to the purposes of the instruction considered by the Supreme Court. *See, e.g.*, *Cornelius*, 696 F.3d at 1321–22.

know, a problem. . . . [T]he Court would certainly like to have you try to reach a verdict in this case. And why don't you continue your deliberations for a while and see if there's any possibility you can reach a verdict in this case." *Id.* The court concluded by stating: "[I]f you find that you're absolutely hopelessly deadlocked, why then I would have nothing else I can do except dismiss you with the thanks of the Court." *Id.*

Here, the district court gave a notice about scheduling, which was followed *two days later* by a largely unrelated inquiry about when the jury wanted to deliberate. In contrast to *McElhiney*, the district court did not pressure the jury by emphasizing the expense of the trial, nor did the court suggest that the jury must reach a verdict. Indeed, the jury had yet to even begin deliberating when the district court made this comment.

In sum, the district court did not plainly err in its interaction with the jury over scheduling matters.

### E. Sentencing

Patterson next challenges the district court's factual finding at sentencing that he was responsible for distributing fifteen kilograms of cocaine. We review the district court's calculation of drug quantities at sentencing for clear error and "will reverse only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Ryan*, 236 F.3d 1268, 1273 (10th Cir. 2001).

The district court determined that Patterson was responsible for distributing fifteen kilos of cocaine based on the testimony of Agent Smith, who recounted the quantities of cocaine that the various co-conspirators sought to distribute. In turn, Agent Smith based his testimony on surveillance of the co-conspirators and his analysis of their wire-tapped conversations. The testimony supported a finding that up to sixty kilograms of cocaine was actually or intended to be distributed during the conspiracy. Patterson offers nothing more than conclusory allegations in contesting this factual finding.

He has not met his burden of showing clear error.

### F. Sufficiency of the Indictment

Patterson next contends the indictment issued against him was defective in that it did not put him on sufficient notice as to the charges against him. Patterson did not raise this claim below, so we review it for plain error. *See United States v. Barrett*, 496 F.3d 1079, 1091 (10th Cir. 2007).

There are a number of problems with Patterson's attack on the indictment. As an initial matter, Patterson erroneously cites to the original indictment filed in this case, not the superseding indictment that served as the basis for the jury verdict. Citing the original indictment, Patterson argues that the lack of precise dates for the criminal activities that Patterson was alleged to have committed in the indictment somehow raises double jeopardy problems. But the superseding indictment in fact provides such dates to almost all of the drug crimes Patterson

was alleged to have committed. Only the cocaine and marijuana conspiracy charges did not contain a precise start date: the superseding indictment notes that the date is unknown to the grand jury. We therefore interpret Patterson's main argument concerning the indictment to be related to the lack of a start date for these conspiracies.

The two principal criteria by which we assess the sufficiency of an indictment are "first, whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense[,] whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *United States v. Washington*, 653 F.3d 1251, 1259 (10th Cir. 2011) (quoting *Russell v. United States*, 369 U.S. 749, 763–64 (1962)), *cert. denied*, 132 S. Ct. 1039 (2012).

Based on this standard, we find no error, let alone plain error. We have reviewed the content of the superseding indictment and are convinced that it sufficiently notifies Patterson of the charges against which he had to defend. We are also satisfied that the indictment and the record provide Patterson with sufficient protection from the risk that he will be placed in jeopardy a second time for the same conduct for which he was convicted, given the specificity with which the government identified at trial the members and goals of the drug conspiracies, the conspiracies' geographic scopes, the drugs distributed in the conspiracies, and

the conspiracies' termination dates. *See also United States v. Young*, 862 F.2d 815, 819 (10th Cir. 1988) ("[K]eeping in mind that reference may be had to the entire record in a subsequent proceeding, the indictment is sufficient to protect the defendant against double jeopardy." (citing *Russell*, 369 U.S. at 763)); *United States v. Pease*, 240 F.3d 938, 942–43 (11th Cir. 2001) (per curium) (holding that an indictment charging a cocaine distribution conspiracy with a start date unknown to the grand jury was sufficiently specific to allow the defendant to plead double jeopardy if charged again for the same conduct). This claim therefore fails.

## G. *Evidence Used for the Wiretap Affidavit*

Patterson's last claim is that the district court erred in not granting his motion to suppress evidence obtained from the government's alleged "illegal use of cell site location information." Aplt. Br. at 20. The entire basis for this claim is a paragraph-long portion of Patterson's opening brief, in which he states that he "adopts and specifically incorporates herein by reference" the motion to suppress he filed in the district court. *Id*.

By failing to develop any argument on this claim at *this court*, Patterson has waived the claim. Under Rule 28(a)(9)(A) of the Federal Rules of Appellate Procedure, an appellant must present in his brief his "contentions and reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Further, parties appearing before this court cannot satisfy Rule

28 by incorporating their claims by reference to either appendices or records from the court below. *See* 10th Cir. R. 28.4 ("Incorporating by reference portions of lower court . . . briefs or pleadings is disapproved and does not satisfy the requirements of Fed. R. App. P. 28(a) and (b)."). To the contrary, "[a]llowing litigants to adopt district court filings would provide an effective means of circumventing the page limitations on briefs set forth in the appellate rules and unnecessarily complicate the task of an appellate judge. Consequently, we adhere to our rule that arguments not set forth fully in the opening brief are waived." *Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 624 (10th Cir. 1998) (citing Fed. R. App. P. 28(g); 10th Cir. R. 28.3); *see also Wardell v. Duncan*, 470 F.3d 954, 963–64 (10th Cir. 2006).

Patterson has not satisfied the requirement for developing an argument set by Rule 28. We therefore do not consider this claim.

## III. Conclusion

Based on the foregoing analysis, we AFFIRM the district court's judgment and sentence.